IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
  CROSSFIT, INC.,                       )
                                        )
      Plaintiffs,                       )
                                        )
          v.                            )
                                        )
DONNY MUSTAPHA, individually and        )
d/b/a CHELMSFORD SPORTS CLUB,           )
      Defendant.                        )
_____ )


AFFIDAVIT IN SUPPORT OF ATTACHMENT OF
PERSONAL PROPERTY OF CROSSFIT INC.

Pursuant to Fed.R.Civ.P. 64 and Mass Gen. L. ch. 223, § 42 et seq., plaintiff Donny Mustapha

("Mustapha"), the owner of the Chelmsford Sports Club (the "Club") (Mustapha and the Club together,

"Plaintiffs") hereby moves that the Court approve the attachment in the amount of $6,000,000 of any

and all right, title and interest of the defendant Crossfit Inc. ("Crossfit"), in or to any personal

property.

I. Summary of Relevant Facts

**Crossfit Inc.**

1. Crossfit Inc. is a Delaware based corporation with Affiliates in all 50 states.

2. Crossfit Inc. is a fitness licensing company founded by Greg and Lauren Glassman in 2001

with the creation of Crossfit.com, an open-source blog.

3. 2003, Crossfit Inc. licenses its first affiliate which grows to 13 affiliates by 2005. From 2005

to 2009 Crossfit Inc. licenses an additional 1000 affiliates.

4. By 2014, Crossfit Inc. has over 8,000 affiliates worldwide, spanning from Greenland to

Australia.

5. Crossfit Inc. draws their revenue from their Affiliates as well as certifications. Certifications

are offered as a Level 1 and Level 2 certification as well as specialty courses. To be considered 'certified' an individual must pay the certification fee of $1,000 and attend a two day seminar ending with a 55 question multiple choice test. A passing score of at least 70% is required to be certified.

6. Crossfit relies heavily on Affiliates for recruitment of new members.

7. The Crossfit Inc. Fitness Regimen (the "Regimen") is "constantly varied, function movements performed at a relatively high intensity." Intensity, in this manner, can refer to a heavy load, high frequency of repetitions, or any combination thereof. The frequency of repetition is inversely proportional to load weight, ie. heavier weight allows for a lower repetition frequency. To achieve a higher frequency, repetitions must be executed at greater speed.

8. This training scheme is known in the fitness world as Conjugated Periodization, also known as the Westside Method, popularized by Louie Simmons in 1982. Simmons makes no claims of this method being proprietary as it had become popular in Soviet training as early as 1960.

9. The Regimen is composed of various preexisting exercises, such as pushups, running, and weighted squats.

10. None of the Regimen's exercises are new or proprietary and many have been around as long as fitness itself.

11. Concrete guidelines with regards to creating a Crossfit workout are sparse but a generic workout template is provided in Crossfit's Level 1 Training Guide. Attached hereto as **Exhibit A** is a true and correct copy of the workout template contained on page 85 of the Crossfit Level 1 Training Guide.

### The Club

12. The Club is a fitness facility located and conducting business in North Chelmsford, Massachusetts.

13. The Club was able to build a large client base through its Boxing Boot Camp, Jr. Kick Boxing, and Yoga.

14. The Club drew many of its clients based on Plaintiffs' very strong reputation in the fitness community.

15. The Club is not, has never been, nor has it ever represented itself as a Crossfit affiliate.

### Affiliates

16. Crossfit Inc.'s Affiliates ("Affiliates") are generally small gyms devoid of machines or treadmills.

17. Affiliates incorporate a low volume, high price business model.

18. Crossfit has maintained this allows for a more intimate setting and better overall quality of service.

19. Crossfit does not require any form of background check or formal interview as part of its affiliation or certification process.

20. Crossfit defines Affiliates as independent contractors within the Crossfit Affiliate Agreement.

21. In the Crossfit Affiliate Agreement Contract, Crossfit explicitly forbids the use of the Crossfit mark in a business element outside of a 'doing business as' designation. Attached hereto as **Exhibit B** is a true and correct copy of the Article 1.1.a (i) of the Crossfit Affiliate Agreement.

### Crossfit Community

22. Crossfit prides itself on the strong sense of community amongst Affiliates and their members. As highlighted in the Affiliation Process, prospective Affiliates are asked to assimilate into the Crossfit Community.

23. Crossfit is an internet based company that relies mostly on a series of message boards and social media pages for communication amongst Affiliates.

24. Through these channels Affiliates can quickly communicate with each other despite geographic limitations.

25. Crossfit uses their main website, their Facebook page, and their Twitter account as the main

means of communication with the general public.

26. In an October 2013 publication Dale Saran, the General Counsul of Crossfit, speaking on behalf of Crossfit Inc., states "...we maintain a direct and personal relationship with our affiliate owners." Affiliates are encouraged to remain constantly vigilant in protection of the Crossfit Mark.

27. Crossfit hosts an IP theft page on their website where Affiliates can report offending gyms. Attached hereto as **Exhibit C** is a true and correct copy of Crossfit's IP theft page iptheft.crossfit.com. A description on the page asks reporting individuals to include what Crossfit can do about the infringement.

28. August 2012, Saran publishes an article on the Crossfit Journal Legal section stating "This also means that as a community, we must enforce our own identity." He goes on later to say "Spread the word, my friends. Police each other."

29. March 2012 Saran publishes an article on the Crossfit Journal ending with "Soon, we hope to have a submission page so I don't have to keep asking you to send me proof, photos and other stuff like that (known in my world as 'evidence') in order to help us investigate."

30. Affiliates have been openly encouraged to help defend the Crossfit Mark. On multiple occasions Crossfit In House Counsel has urged members of the Crossfit Community to be proactive. Attached hereto as **Exhibit D** is a true and correct copy of Dale Saran's solicitation to the Crossfit community in his August 2012 publishing.

31. In 2005, Makimba Mimms, a former US Navy Technician, contracted Rhabdomyolysis, a debilitating condition brought about by rapid breakdown of muscle tissue, while partaking in a Crossfit workout at an Affiliate.

32. In 2008, Mimms won a $300,000 decision after alleging poor supervision during the workout in which he contracted Rhabdomyolysis.

33. Shortly after, Crossfit renamed the workout which caused Mimms to contract Rhabdomyolysis 'Makimba' and recategorized it as a children's workout. Attached hereto as **Exhibit E**

is a true and correct copy of the August 20th Crossfit Kids page containing the workout.

34. August 20, 2008, Crossfit posts a link to Makimba Mimms' lawsuit along with the phrase "Navy Wrestler Makimba Mimms claims permanent disability after kid's workout" on crossfit.com. Attached hereto as **Exhibit F** is a true and correct copy of the August 20th posting on crossfit.com. Page drew over 400 comments.

### Chris Cooper

35. Chris Cooper ("Cooper") is a writer for Crossfit, starting in 2009, and the Crossfit Regional Media Director for Canada East.

36. Cooper is an author for Crossfit.com and prominent figure in the Crossfit community.

37. Chris Cooper has never been to the Club nor had any contact with the Plaintiffs prior to August 2013.

38. Cooper wrote a frivolous review on the Plaintiffs' Facebook page in violation of the FTC's rules regarding product endorsements. [*FTC 16 CFR §255.5*] Attached hereto as **Exhibit G** is a true and correct copy of FTC statute 16 CFR §255.5.

39. Cooper's review along with his prominence in the Crossfit Community invited others to comment and post on Plaintiffs' personal page.  Attached hereto as **Exhibit H** is a true and correct copy of Chris Cooper's review on the Plaintiffs' Facebook page.

40. Cooper retains his post as Regional Media Director for Canada East.

### Russell Berger and Russell Greene

41. Russell Berger ("Berger") is Crossfit Inc.'s Director of Social Media and Certification Course Supervisor.

42. Berger is a frequent poster of Crossfit's message boards and Facebook pages.

43. July 2012, Berger posts a diatribe on Crossfit's message boards containing the contact information of Anthos board members complete with the statement "Don't by shy, let these sharks know what you think." Attached hereto as **Exhibit I** is a true and correct copy of Russell Berger's

message.

44. Russell Greene ("Greene") is the employee in charge of press and public relations at Crossfit Inc.

45. Greene is a frequent poster of Crossfit's message boards and Facebook pages.

46. October 2013, Greene discovers that a company named HTFU is selling a shirt containing the Crossfit Mark.

47. October 2, 2013, Greene makes a Facebook post concerning the shirt along with a hyperlink to HTFU's CEO Mark Gingrich's personal Facebook page. Attached hereto as **Exhibit J** is a true and correct copy of Russell Greene's post.

48. In the same post, Greene mentions that Mark Gingrich had deleted his post previous to Gingrich's personal page.

### Dale Saran

49. Dale Saran is currently In House Counsel for Crossfit.

50. Saran had his own private practice based in Weymouth, Massachusetts from September 2005 – March 2012.

51. Saran is a frequent contributor to the Crossfit Journal's 'Legal' section.

52. Saran frequently posts on Crossfit's message boards and article comment section.

53. Saran is the owner of a blog, Facebook page, and, along with his contributions to the Crossfit Journal, possesses the ability to influence thousands of people.

54. Saran has opening admitted to a role in the affiliation process. Attached hereto as **Exhibit K** is a true and correct copy of Dale Saran's Crossfit message board post referring to reading Affiliate essays.

55. Saran has also admitted to being the individual who has written the Affiliate contract. Attached hereto as **Exhibit L** is a true and correct copy of Dale Saran's Crossfit message board post stating he wrote the Affiliate contract.

56. Saran has a prominent role in Crossfit's affiliation process.

57. Sometime in late 2011/early 2012, Saran offers to pay for Aaron Love to fly to his local gym in order to fight. Attached hereto as **Exhibit M** is a true and correct copy of Dale Saran's Facebook post to Aaron Love.

58. Saran offers to fight Vale Tudo [English translation: 'anything goes'], an early form of mixed martial arts which featured bare knuckle fighting as well as very limited rules.

59. Saran made allusion to the necessity of having medical professionals at the fight.

60. Saran extended same invitation to a person operating under the pseudonym Pukie.

61. December 1st, 2012, Saran engages in a public discussion forum on Facebook regarding Anthos' failed attempt to acquire Lauren Glassman's equity state in Crossfit.

62. In same discussion, several people contest Saran's story of the legal proceedings to which Saran takes exception.

63. December 1, 2012, Saran made post alluding to the fact he went on to the personal page of one of his discussion opponents and confronted the individual. He even went as far as to joke about his actions.  Attached hereto as **Exhibit N** is a true and correct copy of Saran's Facebook post containing described statements.

64. July 4, 2013, Saran posts on the Crossfit Journal in response to an individual proposing that all Crossfit trademark cases should be settled with a 'trial by combat.' Saran responds with "Dude, think about of how quickly we could 'cut down' on IP Theft problems?? :-)"   Attached hereto as **Exhibit O** is a true and correct copy of Saran's Crossfit Journal post.

65. August 23, 2013 at 2:04 am, Saran posts on the "Crossfit Rip-Off Report" on the subject of the Plaintiffs.

66. Two other Crossfit Employees were 'tagged' in a post (a Facebook feature which allows users to send a notification to friends along with a hyperlink to the subject), Saran is the only one to respond.  Attached hereto as **Exhibit P** is a true and correct copy of Saran's Facebook post.

67. Saran expresses his desire to "send in our team of ninjas in the night to slit a few throats and leave a love note."

68. Saran's attempts to dismiss the threatening statement with commentary of such an act being nonproductive but does nothing to mitigate the graphic nature of such a remark.

69. This comment elicited the filing of a police report with the local authorities upon Plaintiffs' discovery of the comment.

70. An email to Mojda Najafi, a member of Crossfit's legal team, was sent out upon the discovery of Dale Saran's comment concerning the Plaintiffs thus making Crossfit aware of his actions.

71. October 1, 2013, Dale Saran posts under Crossfit Journal's legal section advising against specific aspects of Plaintiffs' legal argument used. Saran specifically mentions Plaintiffs' Crossfit Style Training.

72. Dale Saran is still retained as In House Counsel for Crossfit.

**Events April 2013 to August 20, 2013**

73. Plaintiff explored multiple advertising options in order to properly convey the fitness program which would take place within the Club.

74. June 2013, plaintiffs learned Cross-Training is only one of the four defining themes of Crossfit[1], Plaintiffs commenced their "Crossfit Style Training" advertising campaign (the "Campaign") in accordance with the Nominative Fair Use doctrine.

75. At no point did Plaintiffs claim to be a Crossfit affiliate.

76. Crossfit alleged the Club's use of the Campaign, being a non-affiliate, had violated its Federally Registered Trademark.

77. June 21, 2013 Crossfit filed a Trademark Infringement lawsuit (the "Lawsuit") in Massachusetts District Court.

78. Plaintiffs relocated from 51 Middlesex Street, North Chelmsford, Ma to 166 Middlesex

---

1   Crossfit's four defining themes are Neuroendocrine Adaption, Power, Cross-Training, and Functional Movements http://www.crossfit.com/cf-download/Foundations.pdf

Street, North Chelmsford, Ma in late June of 2013.

79. Shortly after, Plaintiffs retained counsel to help with the legal proceedings of the Lawsuit. Plaintiffs continued use of the Campaign as it qualified for as Nominative Fair Use.

80. July 3 Plaintiffs complete renovations at 166 Middlesex street, Plaintiff begin preparations for a contemplated Grand Opening Celebration (the "Grand Opening"). The Grand Opening was to feature a barbecue as well as a pricing promotion which would allow first time members that sign up together to split the first month's membership fee.

81. Plaintiff created a Facebook event page (the "Page") advertising the Grand Opening as well as the aforementioned promotion. The Grand Opening was scheduled for August 31, 2013.

82. Thousands of Facebook members were invited to view the page and attend the event. Per the design of Facebook, any time a person comments within the main page of a Facebook event, each person invited to said event will receive a notification complete with link to view the comment.

### The Crossfit Rip-Off Report

83. The Crossfit Rip-Off Report (the "Rip-Off Report") registered the domain crossfitripoff.com on February 14th, 2013 via Wild West Domains. The Rip-Off Report then created a Facebook page on February 28th, 2013.

84. The Rip-Off Report has nearly 2,300 subscribers, each of which receive a new notification each time there is a new post.

85. Crossfit has acknowledged the existence of the Rip-Off Report, both through direct acknowledgment as well as employee and Affiliate postings on the site.

86. The Rip-Off Report posts a mission on their Facebook page reading "Crossfit Rip-Off Report is dedicated to exposing those who leech from the Crossfit brand without becoming Crossfit affiliates. These charlatans and frauds confuse the public about what Crossfit really is, and harm the legitimate Crossfit affiliates in the process."  Attached hereto as **Exhibit Q** is a true and correct copy of the Crossfit Rip-Off Reports mission from Facebook.com.

87. The Rip-Off Report boasts "...our concern is not what is legal, but what is ethical."

88. The Rip-Off Report had a history of posting gyms that, in their personal opinion, had violated the Crossfit mark with the intent of permanently damaging said gym's public image.

89. The Rip-Off Report boasts about placing phone calls to so called 'frauds' and attempting to have employees refer to their Crossfit as seen in the Rip-Off Reports October 27 post. Attached hereto as **Exhibit R** is a true and correct copy of The Rip-Off Reports October 27th post.

90. The Rip-Off Report posted seven separate comments about the Plaintiffs between August 21st and August 24th 2013.

91. The Rip-Off Report used these posts to elicit defamatory comments both on the Rip-Off Report as well as on the Plaintiffs' Facebook page, Yelp page, and Facebook Event page.

92. The Rip-Off Report promoted the defamatory comments by posting screen shots of comments posted on the Plaintiff's page by disgruntled Crossfit users. The posting of these comments provided positive reinforcement for the actions and provided an avenue for readers to gain notoriety within the Crossfit Community through defamatory comments. Attached hereto as **Exhibit S** is a true and correct copy of the Rip-Off Report's August 23rd post.

93. The Rip-Off Report posted a confrontational message to the Plaintiffs' Facebook page asking "What do you plan on doing with all of your 'Crossfit' branded equipment when you get a cease and desist letter from Crossfit Inc. asking you to stop stealing their trademark? Just curious, thanks." Attached hereto as **Exhibit T** is a true and correct copy of August 21st post.

94. August 21, 2013, The Rip-Off Report attributed the Plaintiffs' page being 'flooded' with comments to the Events page being taken down as well as posting a link to Plaintiffs' personal page. Attached hereto as **Exhibit U** is a true and correct copy of the Rip-Off Report's August 21st post.

95. August 23, 2013, The Rip-Off Report then commands readers with "If you post your own comment on their page, send us a screenshot. [sic]"  Attached hereto as **Exhibit V** is a true and correct copy of the Rip-Off Report's August 23rd post.

96. August 23, 2013, The Rip-Off Report encouraged users to write frivolous reviews for the Plaintiffs in direct violation of FTC 16 CFR §255 regarding endorsements. Attached hereto as **Exhibit W** is a true and correct copy of the Rip-Off Reports August 23rd post.

97. In order to write a Facebook review a user must portray to Facebook that they had been to said location, referred to ask 'check-ins.'

98. Plaintiffs' 'check-ins' drastically increased after August 23, reaching over 600 on August 25[th.]

99. The Plaintiffs, on Facebook's five star rating system, accumulated 30 one star reviews and 2 two star reviews on their Facebook review section, none of which had existed prior to the Rip-Off Review's postings.

100. These reviews were written by individuals who had never made use of the Plaintiffs' fitness services.

101. The cumulative effect of these reviews was a two star decrease in the Plaintiffs' overall rating.  Attached hereto as **Exhibit X** is a true and correct copy of the Plaintiffs' Facebook review section accurate as of October 1st 2013.

102. Crossfit has denied any affiliation with the Rip-Off Report.

103. Crossfit's knowledge of the Crossfit Rip-Off Report without taking action defines the Rip-Off Report as operating under an implied license. *See De Forest Radio Tel. Co. v. United States, 273 U.S. 236, 241* (1927)

104. The Rip-Off Report's apparent implied license would qualify them as an independent contractor the same as Affiliates.

105. As a direct result of the Rip-Off Report's actions Plaintiffs suffered injury.

106. As a direct result of the Rip-Off Report's actions, Plaintiffs suffered irreparable damage to reputation resulting in an unquantifiable injury.

107. The Rip-Off Report continues to operate to this day using the Crossfit Mark.

**Lack of Quality Control and Negligence**

108. Crossfit's affiliation process requires an individual to become Crossfit certified, fill out the application form complete with essay, and pay the affiliation fee.

109. Crossfit's certification (the "Certification") is backed by the American National Standards Institute. ("ANSI")

110. ANSI maintains consensus standards for products, services, systems, processes, and personnel.

111. ANSI does not deal with quality, only consensus standards.

112. The Certification is the first fitness certification to use ANSI.

113. The Certification does not require AED or CPR certifications, as is customary with other fitness certifications.

114. The Certification has a duration of 5 years. 2 years is customary with other fitness certifications.

115. The Certification costs $1000.

116. Crossfit's certification requires an individual to attend two days of seminars.

117. The Certification requires an individual to achieve a score of at least 70% on a test composed of 55 multiple choice questions.

118. The Certification test allows for unlimited retakes at a cost of $150 per retake.

119. The Certification test has a pass rate of 80% as outlined in the L1 Test FAQ. Attached hereto as **Exhibit Y** is a true and correct copy of the portion of the L1 Test FAQ as found on Crossfit.com.

120. Crossfit Inc. has an established affiliation process which every gym must follow in order to affiliate. Attached hereto as **Exhibit Z** is a true and correct copy of Crossfit's online affiliation guide as of January 2, 2013 as found on Crossfit.com which contains the steps:

      a) The first step is to become a Level 1 Crossfit Certified Trainer

b) The certified individual must fill out an application and submit an essay along with

the application. Attached hereto as **Exhibit AA** is a true and correct copy of the

Affiliate Inquiry Form as of January 2, 2013 as found on Crossfit.com

c) Crossfit Inc. states "The other (informal) step is to educate yourself and become a part

of the community." There are no discernible steps to ensure these informal steps are

followed.

d) The applicant must sign the Crossfit Affiliate Agreement Contract. The Crossfit

Affiliate Agreement sets out rules and guidelines an affiliate must follow.

e) Pay the $3,000 affiliation fee. Upon payment of the affiliation fee, a person may begin

calling themselves an Affiliate and advertising using the Crossfit mark.

121. Crossfit Inc. does not execute any form of background check or formal interview when

certifying or affiliating.

122. A person with a history of being a danger to the public can become a Crossfit Affiliate as

long as the minimum requirements are met.

123. In July of 2012 allegations of inappropriate sexual conduct surfaced against Timothy

Devine, a Crossfit affiliate owner in Connecticut. This set off a series of events which ended with the

loss of a life. Crossfit has still not instituted any form of background or formal interview. Attached

hereto as **Exhibit AB** is a true and correct copy of the Connecticut article in which Dale Saran

comments about Timothy Devine.

124. Crossfit has one support email available to their 8,000+ Affiliates.

(affiliatesupport@crossfit.com)

125. October 2013, Keri Mucha posts on the Facebook pages of at least 10 Affiliates expressing

an inability of Crossfit Headquarters to contact these Affiliates. Attached hereto as **Exhibit AC** is a true

and correct copy of ten of Kerry Mucha's attempted correspondence on behalf of Crossfit Headquarters.

126. Crossfit only permits Affiliates to use their mark as part of their "doing business as" or

DBA. (**Exhibit B**)

127. Crossfit explicitly forbids using the Crossfit Mark "...in whole or as part of the formal or registered name for a partnership, corporation, limited liability company, sole proprietorship or other legal entity."

128. Affiliates are strictly forbidden from using the Licensed Mark as part of a formal or registered name.

129. A search of government business registries reveals that in just the five states of California, New York, Virgina, Massachusetts, and Washington there are over 200 LLCs and Corporations containing 'Crossfit' as of January 1st, 2014.

130. Under Massachusetts Law, Apparent Authority is created when "written or spoken words or any other conduct of the principal which reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *See Neilson v. Malcolm Kenneth Co., 303 Mass. 437 , 441 (1939)*

131. Crossfit Affiliates operate under Apparent Authority as defined under Massachusetts law.

## Negligent Hiring and Liability

132. A definition for negligent hiring states "an employer is liable for the harm resulting from its employee's negligent acts 'in the employment of improper persons or instrumentalities in work involving risk of harm to other.'" Labor and Employment Law, Ch. 270, § 270.03.

133. Massachusetts recognizes negligent retention *See Foster v. The Loft, Inc., 26 Mass. App. Ct. 289, 290-91 (Mass. App. Ct. 1988).*

134. In Wright v. Kelleher in denying the company's motion for summary judgment, the court held that Massachusetts law recognized the tort of negligent selection of an independent contractor. *See Wright v. Kelleher, Superior Court of Massachusetts at Worcester, December 1, 2006*

135. Affiliates act on the behalf of Crossfit with regard to protecting Crossfit's brand.

136. No discernible discipline has been enacted by Crossfit with regards to Affiliates who do

not "use its best efforts to preserve, protect, and enhance the good will and value in the Name and Licensed Marks" especially in regards to protecting the Crossfit Brand as outlined in the Crossfit Affiliate Agreement.  Attached hereto as **Exhibit AD** is a true and correct copy of article 1.4 of the Crossfit Affiliate Agreement.

### Facebook Records

137. Plaintiffs published the Grand Opening page on August 20, 2013 containing pictures of the Club and services offered within the Club. Plaintiffs sent out Facebook invitations in hopes of attracting prospective clients to the Club.

138. August 21, 2013 over 10,000 Facebook members from the surrounding area had been invited to the event.

139. 12:56pm August 21, 2013 Brandon Petersen ("Petersen"), co-owner of Crossfit Free in Salem, NH posts "What is CF "style" training? What does that in take? CF is simply a bunch of facets of fitness incorporate into one program. So unsure what CF style training is. Are you guys a CF gym or are you not?" It is clear from Petersen's role as a Crossfit affiliate owner and trainer that he is more than aware of what 'CF' is.

140. 3:24pm August 21, 2013 Tracy Carroll-Grygiel posts "Presently I belong to CrossFit Free in Salem, NH. How is this different? I haven't heard of the boxing aspect."

141. Plaintiffs' page was subject to over 1,000 posts, many posts from Affiliates.

142. Affiliates from as far as Washington posted on the Page.

143. On August 24th, 2013 Plaintiffs received notification that Crossfit legal representative, Mojda Najafi, had filed a petition with Facebook contesting the use of Crossfit's Mark on the Grand Opening page and the Page had hidden the Grand Opening page.

144. Mojda Najafi did not petition Facebook for the removal of any of Plaintiffs' other pages, some containing the phrase "Crossfit Style."

145. Comments contained within the Page used Plaintiffs' personal name as well as other

personal details, permanently linking him to said comments.

146. Comments and posts within the Grand Opening page will only further evidence irreparable damage to Plaintiffs' reputation.

147. As of January 6th, 2014 the Facebook records remain hidden by Facebook at Ms. Najafi's behest.

### Events August 25th, 2013 to Present

148. Following the acts of the Rip-Off Report and Grand Opening page, (the "Events") Plaintiffs received a multitude of emails and phone calls from Affiliates from various regions of the country.

149. Due to nature of the calls, Plaintiffs were forced to cease any form of phone communication creating an inability to communicate with current and potential clients, many of whom believed the gym to have closed due to the content of the Events.

150. Directly following the acts of the Rip-Off Report and Grand Opening page, Plaintiffs' Groupon campaign had only one sale. This is in sharp contrast to the previous campaign in which Plaintiffs had over 500 sales.

151. Plaintiffs suffered enormous loss of revenue following the Events.

152. Plaintiffs reputation in the fitness community was irreparably damaged, contributing to loss of, at that time, current and potential clients.

153. Plaintiff lacks ability to dispute claims made in the Events due to both the large numbers and defamatory nature of posts and comments. As an inherent property of Facebook, many individuals who were not invited to the event still viewed many of the comments. Plaintiff has no way of identifying and communicating with these individuals.

### <u>ARGUMENT</u>

**The Crossfit Affiliate Agreement**

The Crossfit Affiliate Agreement (the "Agreement") is the contractual agreement between

Crossfit and its licensees. Attached hereto as **Exhibit AH** is a true and correct copy of the Agreement as published by Crossfit Backwoods. The Agreement contains many restrictions within it in regards to Affiliate behavior, relationship, and use of the Crossfit Mark. One restriction is the forbidding of using the Crossfit Mark as part of an incorporated business name for Affiliate. [*1.1.A (I)*] 200 LLCs in just five states breaches this restriction. Affiliates are to report potential Crossfit Mark violations they come across [*1.3.C*]. They are also forbidden to take no action against said Affiliates. Employees and Affiliates have routinely taken action against individuals they believe to be illegal using the Crossfit Mark. This is in violation of the Agreement. Affiliates are forbidden from doing anything to damage the good will of the Crossfit name. [*1.4*] This has again been repeatedly violated by Affiliates. Affiliates are not allowed to use the Crossfit Mark in connection with any activity that is illegal or defames. [*1.2.D*] This is clearly violated many times by Affiliates on the Rip-Off Report alone. With these violations and no corrective or disciplinary course of action on the part of Crossfit, the subsections of the contract are longer restrictions and have become covenants.  *See Davis v. Tampa Bay Arena, Ltd., 12-cv-60-T-30MAP (M.D. Fl. June 27, 2013)* The same can be said for the independent contractor portion of the contract. Direction by Crossfit, through publication, to help protect the Crossfit name shows direction from Crossfit, violating the Massachusetts qualities of an independent contractor and thus making Affiliates employees.

**Respondeat Superior**

Employers are held liable for the actions of employee, especially when it falls within the scope of their employment. Saran's, Berger's and Greene's actions were all done well within the scope of their employment. These actions were done to, in their eyes, protect or promote Crossfit Inc. and is within the normal scope of employment for these individuals. Under Respondeat Superior, these individuals are then an agent of Crossfit, making them an extension of Crossfit, therefore Crossfit is liable for their behavior.

Affiliates are repeatedly told to protect the name and, directly and indirectly, encouraged to

confront 'IP Thieves' in order to protect the Crossfit name. Respondeat Superior extends to these Affiliates despite Crossfit holding Affiliates as independent contractors. Crossfit instructs Affiliates to protect the Crossfit name from genericness as evidenced by Dale Saran's, an agent of Crossfit and therefore an extension, repeated publishings and posting.

Crossfit describing Affiliates as non-employees does not make it so. These Affiliates were directed to help Crossfit enforce their mark. These Affiliates were empowered and encouraged by Crossfit, making them agents of Crossfit. It is reasonable to assume that without said behavior by Crossfit, these Affiliates would not have behave in the way they did. Many taxi cab companies use independent contractors as drivers. These drivers do not actively seek out people they believe to be violating the company's mark, and especially do not go as far as to post defamatory comments online. There have been thousands of Trademark Infringement cases but this case is very unique due to Crossfit's behavior.  Crossfit has empowered their Affiliates and told them to police their mark. In conjunction with the articles of the Agreement being covenants as ruled in Davis v. Tampa Bays Arena Affiliates are employees of Crossfit.

**Negligent Hiring**

Massachusetts recognizes negligent hiring as well as negligent retention. The definition used for the two is "an employer is liable for the harm resulting from its employee's negligent acts 'in the employment of improper persons or instrumentalities in work involving risk of harm to other.'" *see Labor and Employment Law, Ch. 270, § 270.03.* Crossfit has been negligent in hiring and retention. Crossfit does not conduct a background check, has no formal interview, and relies almost exclusively on an individual's personal essay attached to their application. Essay is not proctored or otherwise ensured to be written by applicant. As a result, Crossfit has very little knowledge of a person at time of affiliation. Crossfit exercises very little discretion in granting Affiliations.

Crossfit has negligently retained individuals who have demonstrated themselves to no longer be fit to be licensed or affiliated with Crossfit. The Crossfit Rip-Off Report is operating under an implied

license *see De Forest Radio Tel. Co. v. United States, 273 U.S. 236, 241 (1927)* and Crossfit has not

attempted to stop or severe ties with such organization. The Rip-Off Report continues to insight

defamatory comments from individuals in the Crossfit community, both Affiliated and non. Crossfit is

responsible for the actions of these individuals acting on their behalf.

**Negligent Retention**

Crossfit has exercised negligent retention with regards to employees Dale Saran, Chris Cooper,

Russell Berger, and Russell Greene. Dale Saran has shown a pattern of behavior, and the pattern is

clear. Anyone who opposes Saran will be subject to personal attacks and violent threats, the likes of

which are serious enough as to warrant contacting the police. Saran's prominence in the Crossfit

community only serve to intensify the seriousness of these threats. Saran provides a blueprint for other

members of the Crossfit community to follow. If someone is believed to be in violation of the Crossfit

mark or even someone who has disagreed with them the course of action is clear. As Saran is a major

part of the affiliation process, it is unlikely that he will be disciplining any individuals who follow his

lead. The same can be said for Cooper, Berger and Greene, as Cooper willingly posted frivolous

reviews on Plaintiffs' page and with Berger and Greene as they are not opposed to posting the

information of other company's executive officers along with statements such as "let these sharks know

what you think." These are acts that Crossfit, as an internet based company, should discipline if not

terminate these members for yet they all currently hold their positions. The Crossfit Rip-Off Report is

not immune from this negligent retention.

**Role as Independent Contractors**

Crossfit asserts that all of their Affiliates are independent contractors and not employees. As

independent contractors are, by definition, free to operate however they see fit, it is impossible to

assure quality control while still maintaining an independent contractor relationship. These two ideas

are directly conflicting and cannot both be true. Secondly, Massachusetts has very rigorous rules

regarding independent contractors. If Crossfit Affiliates are proven to be employees, not independent

contractors, Respondeat Superior would automatically apply to all actions of Crossfit Affiliates. To be considered an independent contractor, an individual performing a service must fulfill the conditions (*M.G.L. c. 149, § 148B*):

> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and

> (2) the service is performed outside the usual course of the business of the employer; and,

> (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

The service described above are the nutritional and fitness services provided by Crossfit Affiliates. In the Crossfit Affiliate Agreement, Crossfit stipulates that any licensed services which advertise the Crossfit mark must use Crossfit Level 1 Certified Trainers. Crossfit Kids courses must also be taught by Crossfit Kids certified trainers. This does not satisfy condition 1 of the independent contractor test as it limits puts a limitation on the performance of services provided. Attached hereto as **Exhibit AE** is a true and correct copy of the portion of the Crossfit Affiliate Agreement concerning required Level 1 trainers. Also, Crossfit controls the content of a Level 1 certification. A Crossfit Level 1 Trainer is going to impart that knowledge in their services provided. This equates to Crossfit providing the training for Affiliates. Therefore, Crossfit controls which knowledge these required trainers have as well as their training methods when providing fitness services. By requiring Crossfit Level 1 Trainers to teach Crossfit licensed services, Crossfit is controlling said services violating condition 1 of being independent contractor.

Crossfit relies on Certification and Affiliation fees for revenue. Crossfit relies almost exclusively on the services provided in Affiliate gyms to recruit individuals to apply for Affiliation and Certification. Crossfit's journal and message boards are not tools used to recruit. They are used for information purposes only. There are no other discernible recruitment tools outside of the fitness

services provided in Affiliates. As Crossfit directly draws it revenue from recruitments generated by these services, they should be considered well within Crossfit's normal course of business.

Lastly, Crossfit is directing Affiliates to police their mark on the internet. This is a direction on the part of Crossfit and shows the nature of the Affiliate relationship. Despite any statement by Crossfit to the contrary, Affiliates are under the control of Crossfit.

**Lack of Quality Control**

Crossfit claims that it does not exert much control over their Affiliates. Freedoms extended to Affiliates, from a business perspective, are outlined in the Affiliate Agreement. These business freedoms, if they fully exist, create a large variation in quality between Crossfit gyms. This in itself is misleading to consumers. A consumer should be assured of the quality of the product when they enter a Crossfit gym but this is not so. A poorly structured Affiliation process does nothing to ensure that the product is consistent. This is further reinforced by Crossfit's lack of follow up and communication with Affiliates evidence by a Crossfit Headquarters representative having to resort to posting on several Affiliate's Facebook pages describing their inability to reach said Affiliates. Quality control and Crossfit's stance that Affiliates are independent contractors are in direct contrast to each other. It is impossible to have reliable quality control if Affiliates are independent contractor as Crossfit claims due to the freedoms an independent contractor is afforded. This lack of quality control is incredibly misleading to consumers who should be assured of the product the are receiving along with the Crossfit name.

**Statements were Clearly Defamatory**

Statements made about Plaintiffs were clearly defamatory. A statement is defamatory if it "may reasonably be read as discrediting [the plaintiff] in the minds of any considerable and respectable class of the community." *See Disend v. Meadowbrook Sch., 33 Mass. App. Ct. 674, 675 (1992)*. These statements permanently discredited Plaintiffs in the minds of the fitness, an industry Plaintiffs have worked exclusively in for almost 20 years.

**Libel**

To succeed on its claims of Libel, a plaintiff must demonstrate: (1) that the defendant published a written statement; (2) of and concerning the plaintiff; (3) defamatory; (4) false or spoken with 'actual malice', and (5) either caused economic loss, or is actionable without proof of economic loss. *See Noonan v. Staples, Inc., 2007 WL 6064454 (D. Mass. June 28, 2007)* Crossfit and Agents of Crossfit wrote clearly defamatory statements about Plaintiffs on The Rip-Off Report as well as Plaintiffs' personal property. Statements were clearly malicious: "malice in the popular sense of hatred or ill-will." *See Connor v. Standard Publishing Co. 183 Mass. 474, 480.* As a result, Plaintiffs have suffered irreparable damage to reputation.

**Intentional Interference with Advantageous Relations**

Under Massachusetts law, a plaintiff bringing a claim for intentional interference with advantageous relations must show: (1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's interference with the relationship through improper motive or means; and (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct. *See Am. Private Line Services, Inc. v. E. Microwave, Inc., 980 F.2d 33, 36 (1st Cir. 1992); Blackstone v. Cashman, 448 Mass. 255, 260 (2007)*. An "advantageous relation" is a "contemplated contract" or prospective business relationship. *Buster v. George W. Moore, Inc., 438 Mass. 635, 652 n.22 (2003)*. Plaintiffs' maintained advantage with reputation as well as price point significantly lower than competition. Plaintiffs had many established business relationships as well as potential relationships in the surrounding community. Crossfit as well as agents of Crossfit knew of such relationships and used defamatory comments on the Rip-Off Report and on Plaintiffs' personal property to interfere with said relationships resulting in permanent loss of said advantage.

**Unfair Methods of Competition**

In the state of Massachusetts, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful. (*M.G.L. c. 93A, § 2A*)

Unfair methods of competition do not have a definitive test or proof but qualify on a case by case basis. Crossfit has participated in unfair methods of competition. The violent threat by their In House Counsel Dale Saran was seen by many of the Plaintiffs' current and prospective members. Said threat was used to frighten and intimidate Plaintiffs and said members. Courts will be guided by the interpretations given by the Federal Trade Commission and Federal Courts. (*M.G.L. c. 93A, § 2B*) The actions of Crossfit employee Chris Cooper, amongst others, were a direct violation of FTC law and were used to cause injury to Plaintiffs. All actions of Affiliates were encouraged and used by Crossfit to hamper and impede Plaintiffs' business, resulting in injury. Plaintiffs suffered

**Injury to Plaintiffs**

Plaintiffs have suffered injury to both business operation and reputations. Crossfit is a multinational corporation with faithful followers on every continent outside of Antarctica. Plaintiffs have suffered injuries to reputation in fitness community at the hands of Crossfit Affiliates. Unfortunately with Crossfit's great expanse, a geographical relocation will not remedy said injury. As described before, Plaintiffs professional skills are exclusive to the fitness industry and have poor translation to other industries. This leaves plaintiff with no options but to remain in the fitness industry with an irreparably damaged reputation. Due to number and nature of statements, injury to reputation will persist effectively having permanent damage.

**Likelihood of Success in Libel Case**

Plaintiffs are likely to succeed at or above amount requested for attachment. Crossfit's practice of negligent hiring and retention is clear as is the lack of quality control amongst the Crossfit name. Statements made clearly fit the requirements for defamation and libel. Statements have resulted in injury to Plaintiffs with reputation and business operation.

With regards to amount, Crossfit is a household name with the ability to reach and influence millions across the world. Keeping with this, Crossfit has previously shown that they will use their expansive reach to further use their influence despite pending or previous litigation. Crossfits' renaming

the workout in which Makima Mimms suffers Rhabdomyolysis 'Makima' and reclassifying the workout as a children's workout not only personally insults Mimms, who is permanently disabled as a result, but shows a lack of respect towards the court who heard Mimms' case. (**EXHIBIT E**) At the time of Dale Saran's threatening statement toward Plaintiff he acknowledged that Crossfit was already in legal proceedings with Plaintiffs. (**EXHIBIT P**) Similarly, in his October 1st publishing, Dale Saran specifically argues against nominative use and mentions Plaintiffs' Crossfit Style Training. Attached hereto as **Exhibit AF** is a true and correct copy of the portion Dale Saran's October 1, 2013 Crossfit Journal publication referencing "nominative usage." Attached hereto as **Exhibit AG** is a true and correct copy of the portion of Dale Saran's October 1, 2013 Crossfit Journal specifically mentioning Crossfit Style Training. This behavior keeps in Crossfit's vigilantism and demonstrates that they will not rely on the courts to hear and determine cases. They will use their massive influence as a tool to tell what they believe is correct.

For this reason Plaintiffs feel they will likely succeed at or above amount requested in attachment. In Massachusetts, unfair methods of competition warrants treble damages and is determined by FTC and Federal courts. Many of these statements were made in violation of FTC statutes, adding to their reprehensible nature [*16 CFR §255*]. These statutes have been heavily enforced in New York State with over $350,000 worth of fines being assessed. Crossfit's has added to injury in past cases and has indicated they are not opposed to doing the same toward Plaintiffs. In Massachusetts case *Murphy v. Boston Herald, Inc. 449 Mass. 42 (2007)*, Judge Ernest B. Murphy won a 2.1 million dollar decision, held up upon appeal, against The Boston Herald for articles published in a 2002 article. Murphy was able to retain his position as Judge meaning this amount was based purely on loss of reputation. Plaintiffs are unlikely to recover from Crossfit's actions. Plaintiffs have suffered a potentially worse loss of reputation with an even larger audience due to Crossfit's reach. In Massachusett's case *Clay Corporation v. Colter, Norfolk County, Massachusetts, Civ. No. 12-01138*, an internet defamation case, two defendants published defamatory statements about Clay Nissan's release

of an employee who was sick with cancer. The Clay Corporation was awarded a 1.5 million dollar

pre-judgment attachment. Plaintiffs are likely to succeed far beyond that amount based on the number

of statements, personal content of statements, and multinational scope. Also, the Clay Corporation,

being a large company, had proper channels to dispute any such statements. Plaintiffs' lack any

channels to dispute these statements. Overall, the true toll of the damages will not be known for a long

time as Plaintiffs were effectively silenced.

The Plaintiffs' Grand Opening Facebook Page will only further reinforce the above statements.

These pages contained over 1,000 posts, most coming from Crossfit Community members. These

statements were defamatory in nature and, being on the Plaintiffs' page, occurred on their property. It is

the same as a defamatory statement being spray painted on a business' street sign. Release of these

pages will provide even more evidence to support Plaintiffs' claim, furthering the likelihood to succeed.

Upon release of the Facebook Page, Plaintiffs will add more irrefutable evidence to support claims.

**Conclusion**

Although Plaintiffs has substantial evidence to support his defamatory claims, there is

significantly more evidence with the Plaintiffs' Grand Opening Facebook Page. Plaintiffs have reason

to believe that statement made on said page much be more defamatory and violent than statements

made in other locations. Plaintiffs have reason to believe this to potentially be the worst case of internet

defamation with regards to scope of individuals making defamatory comments and number of

defamatory comments. This would warrant a judgment at or above $6,000,000.

This Motion should be granted in order to provide pre-judgment security to Plaintiffs that

may be available to satisfy judgments that Plaintiffs expect to obtain in the captioned action.

<u>Standard for Granting Relief</u>

Pursuant to Fed.R.Civ.P. 64, Mass Gen. L. ch. 223, § 42 et seq., and Mass. R. Civ. P. 4.1,

an order may be granted approving attachment of personal property upon findings by the court that

there is a reasonable likelihood that the plaintiff will recover judgment in an amount equal to or greater

than the amount of the attachment over and above any liability insurance known or reasonably believed to be available.

Based upon the pattern of conduct of the Defendants, and the alleged evidence related thereto, there is a substantial likelihood and reasonable expectation that Plaintiff will be awarded judgment against the defendants, exclusive of all costs, in excess of $6,000,000. Plaintiffs are aware of no liability insurance coverage available to any of the above-named Defendants to satisfy a judgment against them in this action. Finally, Plaintiffs will suffer substantial and irreparable harm if it is not granted the relief requested in this motion and the motions filed herewith because Plaintiffs knows of no other assets of the Defendants from which the ultimate judgment can be satisfied.

WHEREFORE, Plaintiff Donny Mustapha hereby respectfully requests that this Court approve an attachment in the amount of $6,000,000 on any and all right, title and interest in or to any personal property owned by Defendants Crossfit Inc.

Respectfully Submitted,

Donny Mustapha. Pro Se, Litigant
North Chelmsford, Ma. 01863
Dated: January 6, 2014