## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| CROSSFIT, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 13-11498 |
| ) | |
| DONNY MUSTAPHA, individually, and ) | |
| d/b/a CHELMSFORD SPORTS CLUB, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## MEMORANDUM OF LAW IN SUPPORT OF CROSSFIT'S
## MOTION TO MODIFY PRELIMINARY INJUNCTION

Victor H. Polk, Jr., BBO# 546099
polkv@gtlaw.com
Zachary C. Kleinsasser, BBO# 664291
kleinsasserz@gtlaw.com
Jessica Parker-Battle, BBO# 679362
parkerbattlej@gtlaw.com
Greenberg Traurig, LLP
One International Place
Boston, Massachusetts  02110
Tel: (617) 310-6000
Fax: (617) 310-6001

Dated: February 25, 2014

*Counsel for Plaintiff CrossFit, Inc.*

The Preliminary Injunction entered by the Court (the "Preliminary Injunction") prohibits Defendants from using "'CROSSFIT, including any substantially similar variation, such as 'CrossFit' or 'Cross Fit,'" in connection with Defendants' fitness training services.  Dkt. 28. Defendants' continuing use of "CrossFit" to advertise their services – in violation of the express terms of the Preliminary Injunction – is the subject of a separate Motion for a Finding of Contempt and Modification of Preliminary Injunction (the "Contempt Motion").  Dkt. 32.

Defendants have now also adopted a series of additional marks plainly intended to further trade off the goodwill associated with the CrossFit mark.  After the Preliminary Injunction issued, Defendants began promoting fitness training classes that they refer to as "CrossBox," "CrossKick," and "CrossTrain."  Defendants are plainly seeking to circumvent the purpose of the Court's order, to invoke the CrossFit mark, and to cause consumers to associate the Club's services with CrossFit.  Each of these terms look and sound like "CrossFit."  They begin with the same, dominant prefix ("Cross"), add a peripheral term related to fitness, and use the same "camel hump" stylization as "CrossFit."  The Club markets these training classes using unique words and phrases, such as "universally scalable," that are identical to descriptions of CrossFit classes.  The Club's description of its "CrossTrain Fitness Program," for example, includes a sentence that appears to have been copied and pasted directly from CrossFit's website.  In order to associate the Club even more closely with the CrossFit brand, Defendants even began using the tagline "Fitness isn't a sport its [sic] a lifestyle" in all of the Club's logos – even though CrossFit has long used the tagline "Fitness as a Sport."

Enough is enough.  Defendants' use of "CrossBox," "CrossKick," "CrossTrain," and "Fitness isn't a sport its [sic] a lifestyle" (the "New Marks") constitutes further trademark infringement and should be enjoined.  In addition, it is well established under the "safe distance

rule" that "an infringer, once caught, must expect some fencing in."  This Court possesses broad discretion to vindicate the Preliminary Injunction by prohibiting modifications of "CrossFit" that do not move a "safe distance" away from trademark infringement.  Having crossed the line of fair competition, Defendants should be ordered to stand back from it.

Thus, the Preliminary Injunction should be modified, and Defendants should also be (a) required to delete all references to, and restrained and enjoined from using, "CrossBox," "CrossKick, "CrossTrain,"[1] and "Fitness isn't a sport its [sic] a lifestyle" or substantially similar variations; (b) required to replace all references to "Fitness" with "fitness" when adjacent to "Cross" or any word containing the prefix "Cross"; and (c) restrained and enjoined from using "Fitness" when adjacent to "Cross" or any word containing the prefix "Cross."

## STATEMENT OF FACTS

**A.    CrossFit and the CrossFit Mark.**

Developed in the early 1980s, CrossFit is a popular brand of fitness training that helps individuals improve their physical well-being and cardiovascular fitness in an encouraging environment.  CrossFit defines its fitness training program as "constantly varied functional movements performed at a relatively high intensity."  In addition to its unique fitness training regimen, CrossFit sells products and offers numerous services under the CrossFit brand, including entertainment services, charitable fundraising, footwear, and clothing.  PI Aff. ¶2.[2]

Over the last three decades, CrossFit has worked diligently and invested substantial resources in promoting the CrossFit brand.  To keep the CrossFit community apprised of updates

---

[1] CrossFit does not seek to enjoin Defendants from using the terms "cross-train" or "cross-training" as nouns, but only the stylized term "CrossTrain" as a brand name for a gym and fitness training program.  While CrossFit originally indicated a willingness to allow Defendants to use "Crosstrain" in certain circumstances, by adopting the "CrossBox" and "CrossKick" marks without approval, Defendants have made it crystal clear precisely why they seek to use the term "CrossTrain" – to trade off CrossFit's goodwill.

[2] CrossFit submitted the Affidavit of Mojda Najafi dated August 29, 2013 in support of CrossFit's Motion for Preliminary Injunction (the "PI Aff.").  *See* Dkt. 14.

and news, CrossFit publishes the "CrossFit Journal" on a monthly basis.  It posts daily workouts – referred to as "workouts of the day," or "WODs" – on its website.  CrossFit has also undertaken high profile marketing efforts, including a close promotional relationship with Reebok, and airing a CrossFit advertisement during the 2012 Super Bowl.  CrossFit's hard work to promote its brand has paid off.  7,240 gyms across the world are accredited CrossFit affiliates, and CrossFit's website averages nearly 35 million hits per year.  *Id.* ¶¶3-4.

CrossFit owns seven federal trademark and service mark registrations for the word mark "CrossFit," including registrations for fitness training, charitable fundraising, scientific research relating to exercise and human performance, entertainment services (e.g., videos and podcasts), clothing, and footwear.  The "CrossFit" service mark registration for fitness training services, Registration No. 3,007,458, was issued on October 18, 2005.  *Id.* ¶¶ 5-6.

In order to make its fitness training techniques widely available, CrossFit encourages individuals and entities that adhere to the "CrossFit philosophy" to become affiliates and to become licensed to use the CrossFit name.  CrossFit and affiliates enter into standard affiliate agreements, which define the terms and conditions of the affiliate relationship.  *Id.* ¶7.

CrossFit's careful cultivation, maintenance, and protection of its intellectual property rights have enabled CrossFit to amass considerable goodwill within its industry, and the CrossFit name is widely recognized around the world.  Consumers readily and singularly associate the CrossFit name with CrossFit's business and services.  *Id.* ¶8.

**B.       CrossFit's Complaint.**

The Club, which is owned by Defendant Mustapha, is a fitness facility located in Chelmsford, Massachusetts that has used the CrossFit Mark to offer and promote its services.

The Club has never been a CrossFit affiliate, and CrossFit has never authorized the Club's use of the CrossFit Mark.  The Club does not have a license agreement with CrossFit.  *Id.* ¶9.

In October 2012, CrossFit learned that the Club was advertising "CrossFit" classes. CrossFit advised Defendants that they were infringing, and demanded that Defendants remove all references to CrossFit on the Club's website and in the Club's promotional materials.  Over the next several months – and notwithstanding CrossFit's numerous cease and desist communications – Defendants continued to advertise and offer exercise programs using the CrossFit trademark.  *Id.* ¶¶10-15.  In light of Defendants' refusal to stop its willful infringement, CrossFit filed its Complaint on June 21, 2013.

## C.    The Preliminary Injunction.

Instead of removing the protected marks from the Club's promotional materials after CrossFit filed its Complaint, Defendants enlarged their use of the CrossFit mark.   They prominently featured the word "CROSSFIT" in large, bold, all-capital letters on the homepage of their website, accompanied by the words "Style Training" in a barely legible, cursive font. "CrossFit" or some derivation thereof appeared nearly 70 times on the Club's website.  *Id.* ¶¶17-30.  Not surprisingly, CrossFit customers were confused about whether the Club was affiliated with CrossFit.  *Id.* ¶¶31-32.  CrossFit was left with no choice but to file a Motion for Preliminary Injunction barring Defendants from using the CrossFit marks.

After hearing, and "for good cause shown," the Court entered the Preliminary Injunction, which contained three salient instructions for Defendants:

> 2.    Defendants shall not use or display the Protected Mark [CROSSFIT] in connection with the provision of Fitness Training Services.
>
> 3.    Defendants shall not use or display the Protected Mark in any Advertisement for Fitness Training Services.

4. Notwithstanding the foregoing, Defendants may use or display the Protected Mark if legally permissible as a nominative fair use. If Defendants intend to make a nominative fair use of the Protected Mark in connection with the provision of Fitness Training Services, they shall provide a copy of each such proposed use to counsel for plaintiff no less than ten days before the actual use, so that the parties may have an opportunity to negotiate a resolution of any dispute or, if necessary, to contest the legality of the use before this Court.

Dkt. 28. The Court also provided the following definitions:

b. "Protected Mark" shall mean "CROSSFIT," including any substantially similar variation, such as "CrossFit" or "Cross Fit."

c. "Fitness Training Services" shall mean any training, coaching, or education services concerning physical fitness or exercise.

d. "Advertisement" shall mean any advertisement, flyer, brochure, billboard, display, direct mailing, television commercial, radio commercial, or similar communication of marketing, advertising, sales, or promotional information or materials directed to the general public or segments of the general public.

## D. Defendants' Motion for Contempt.

In the days and weeks after the issuance of the Preliminary Injunction, Defendants repeatedly used "CrossFit" in a manner not even arguably constituting "nominative fair use" or in compliance with the injunction. After the Preliminary Injunction issued, for example, the CrossFit mark appeared *217 times* on the Club's website, including *23 times* on the Club's homepage alone. Contempt Aff. ¶15.[3] The Club's Facebook page and blog made hundreds of references to CrossFit; the Club's blog alone included *more than 300* links to www.crossfit.com. *Id.* ¶18. Defendants also took text approved by CrossFit and plastered the Club's website, Facebook page, and blog with "disclaimers" of affiliation with CrossFit. *Id.* ¶¶24, 26. These pervasive references to CrossFit did not compare Defendants' services to CrossFit's services, but

---

[3] CrossFit submitted the Affidavit of Zachary C. Kleinsasser dated November 6, 2013 in support of CrossFit's Motion for Contempt (the "Contempt Aff."). *See* Dkt. 34.

merely used the CrossFit brand name to define what Defendants were selling. Indeed, Defendants' "disclaimers" did far more to associate Defendants with CrossFit than to actually disclaim affiliation. In view of Defendants' blatant violation of the Preliminary Injunction, CrossFit filed its Contempt Motion. Dkt. 32.

**E.     Defendants' Counsel Withdraws.**

Eight days after CrossFit filed its Contempt Motion, Defendants' counsel filed a Motion for Leave to Withdraw as Counsel, citing Defendants' "repeated failure to cooperate with counsel"; "irreconcilable conflicts over litigation tactics"; and Defendants' "persist[ence] in pursuing objectives that counsel considers imprudent" under the Massachusetts Rules of Professional Conduct. Dkt. 35. Defendants are now proceeding *pro se*.

**F.     Defendants' Continued Infringement.**

In addition to using the "CrossFit" mark after the Court issued the Preliminary Injunction, Defendants re-named their gym the "CrossTrain Sports Club" and began describing their fitness training services as "CrossTrain Fitness." Klein. Aff. ¶3 & Ex. A.[4] They even started using the tagline "Fitness isn't a sport its [sic] a lifestyle" even though CrossFit has long used the tagline "Fitness as a Sport." *Id.* Ex. B. The following logo now appears at the top of every page of the Club's website:



Defendants also began marketing "CrossBox," "CrossKick," and "CrossTrain" classes.

*1.*     ***"CrossBox"*** Defendants advertise "CrossBox" as employing:

---

[4] CrossFit has submitted the Affidavit of Zachary C. Kleinsasser in Support of CrossFit's Motion to Modify Preliminary Injunction ("Klein. Aff.") simultaneously herewith.

a unique set of training tools designed to challenge the status quo of conventional fitness equipment.  Heavy Bags, jump ropes, battle ropes, and sometimes even truck tires and sleds, are used along with plyometric exercises to create a balanced circuit where you safely progress at your own pace.  CrossBox is good for all fitness levels and can be scaled to your unique individual needs.

*Id.* Ex. C.  With a few tweaks, Defendants' description of "CrossBox" could easily serve as a description of a CrossFit class.  Below is a table comparing "CrossBox" with a description of CrossFit taken from the website of a certified CrossFit affiliate located in Chelmsford:

| "CrossBox" | CrossFit |
|---|---|
| "can be scaled to your unique individual needs" | "can be scaled to meet the needs [ranging from] elite athletes to our grandparents" |
| "jump ropes" | "jump roping" |
| "battle ropes" | "rope climbs" |
| "plyometric exercises" | "plyoboxes" and "box jumps" |
| "good for all fitness levels" | "tailored for every athlete at any fitness level" |
| "sleds" | "weighted sleds" |
| "Heavy Bags" | "sand bags" |

*Id.* Exs. C, D.

> **2.**     "***CrossKick***"  Defendants' online promotions describe "CrossKick" as follows:

A blend of boxing and cross-training, CrossKick combines a variety of exercises such as heavy bag work, jumping roping [sic], and kettleball swings to give members a full-body workout. . . .

*Id.* Ex. E.  Again, with some minor changes, Defendants' description of "CrossKick" could serve as a description for a CrossFit class offered at the certified CrossFit affiliate in Chelmsford:

| "CrossKick" | CrossFit |
|---|---|
| "heavy bag work" | "sand bags" |
| "jumping roping" | "jump roping" |
| "plyometrics" | "plyoboxes" |
| "kettlebell swings" | "Kettle bells" |

*Id.* Exs. D, E.

*3.*     *__CrossTrain__*   Defendants' "CrossTrain Fitness Program" is even more closely tied to CrossFit.  Clicking on the link for "CrossTrain Classes" brings up a webpage called "Our CrossTrain Fitness Program" that does not actually include any information about the program. Instead, the webpage includes a paragraph-long description of CrossFit's workout routines, how CrossFit affiliates obtain their daily workouts, and the admission that the Club relies upon www.crossfit.com for its daily workouts.  "CrossFit" appears *six times* in the paragraph.  Having associated itself with CrossFit, Defendants then include the "disclaimer" that "we're not a CrossFit affiliate and we make no claim that we're offering the CrossFit brand." *Id.* Ex. F.

The webpage that *does actually* describe the supposed "CrossTrain Fitness Program" includes language that mirrors CrossFit.   Among other things, Defendants declare that "CrossTrain" is a "universally scalable fitness program [that] is the perfect application for any committed individual regardless of experience."  *Id.* Ex. G.  This statement appears to be lifted directly from the "What is CrossFit?" webpage on CrossFit's website, which explains that CrossFit is designed for "universal scalability making it the perfect application for any committed individual regardless of experience."  *Compare id.* Ex. G *with* Ex. H.

Perhaps most telling are two links available to users who hover over the "CrossTrain Classes" tab on the Club's website:  (1) a "Similar Workouts, Better Price" link and (2) a "Similar Workouts, Better Price page 2" link.  Clicking on these links brings users to pages containing the following statement, which appears above nine photographs, each with a caption "disclaiming" any affiliation with CrossFit:

*The CSC is in not affiliated, associated with or endorsed by Crossfit Inc. The average affiiated club is $200.00 per month, the CSC is $49.99! Similar workouts, Better Price*

*Id.* Ex. I.  In other words, Defendants are directly comparing their "CrossTrain Fitness Program" to CrossFit, and even describing "CrossTrain" as "similar" to CrossFit.

8

*4.* ___Promoting "CrossBox," "CrossKick," and "CrossTrain"___   In the months since the Preliminary Injunction issued, Defendants have heavily advertised their "CrossTrain," "CrossBox," and "CrossKick" classes.   In some instances, Defendants have directly compared the training offered at these classes to CrossFit.   For example, in an unapproved promotion on Amazon Local for "CrossTrain, CrossBox, or CrossKick" classes, Defendants boasted that these classes take place in a "10,000 square-foot fitness space **with a competitive CrossFit program** that suits your needs."   *Id.* Ex. J.   In a recent Groupon advertisement, Defendants offered several months of "Unlimited Crosstraining Classes at CrossTrain Fitness," explaining that their "cross-training classes are similar in style to CrossFit" and that "CrossTrain Fitness" was "[i]nspired by CrossFit."   *Id.* Ex. K.   Defendants' "About" page on Groupon similarly notes that CrossTrain workouts were "[i]nspired by CrossFit."   *Id.* Ex. L.

## G.    Evidence of Consumer Confusion.

Several consumers have expressed confusion about the Club's affiliation with CrossFit. One CrossFit customer contacted CrossFit after receiving an e-mail from Amazon.com advertising "CrossFit" and "Boxing Boot Camp" classes at the Club because he could not locate the Club on CrossFit's "Affiliate Finder" webpage.   PI Aff. ¶10 & Ex. D.   Another CrossFit customer posted a comment on the Club's website, asking "Are you an affiliate?"   *Id*. ¶31 & Ex. Y.   Even a member testimonial featured on the Club's website illustrates that consumers have confused legitimate CrossFit classes with the classes offered by the Club.   "Michelle C" of Lowell posted that a boxing boot camp "got me ready for the crossfit classes that I do now.  I've been doing crossfit for about 2 months and loving it."   *Id.* ¶31 & Ex. Z.   A customer review of the Club on the website Yelp.com shows the extent to which consumers genuinely believed the

Club was offering CrossFit:  "I . . . emailed [the Club].  I got a response and made it to try out CrossFit.  The guy running CrossFit was pretty awesome."  Klein. Aff. Ex. M.

Other posts to the Club's Facebook page demonstrate confusion and highlight the real harm that CrossFit is suffering (and will continue to suffer) absent a modification to the Preliminary Injunction.  On August 21, 2013, a customer responded to a post about the Club using the CrossFit Mark by declaring:  "CrossFit style training!?  Sign me up!  Who needs all that affiliate fee nonsense when you can find a loop hole."  PI Aff. ¶32 & Ex. AA.  Another reader commented "I actually think its pretty cool that this place [the Club] is offering it [CrossFit "style" training] so cheap…Hitting an even broader target audience."  *Id.* Ex. BB.

## ARGUMENT

The Preliminary Injunction should be modified to protect against confusion among CrossFit's customers, and to preserve CrossFit's goodwill and reputation.   A preliminary injunction is proper where, as here, the plaintiff demonstrates:  (1) a likelihood of success on the merits; (2) that a denial of relief will result in irreparable injury; (3) the balance of equities favors the plaintiff; and (4) "the public interest will not be adversely affected by the granting of the injunction."  *Equine Techs, Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 544 (1st Cir. 1995). Further, the Preliminary Injunction should be modified in light of the "safe distance rule," which vests broad discretion in the Court to ensure that the Lanham Act is not frustrated by Defendants' attempts to circumvent the injunction.

## I.     CROSSFIT IS LIKELY TO SUCCEED ON THE MERITS OF ITS TRADEMARK INFRINGEMENT CLAIMS.

To succeed on its claim for trademark infringement, a plaintiff must show that it has a protectable mark and that the defendant's use of its mark results in a likelihood of confusion. *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 116 (1st Cir. 2006).

Here, the CrossFit Marks are protectable.  *See* Preliminary Injunction Order (defining CrossFit mark as "Protected Mark").  Because the CrossFit Mark is federally registered, it is entitled to a legal presumption of ownership and validity.  *See* 15 U.S.C. § 1115(a).  Moreover, the CrossFit Mark is "incontestable."  *See* 15 U.S.C. § 1065.  CrossFit, therefore, owns the CrossFit Mark and has the exclusive right to use the CrossFit Mark.  *See* 15 U.S.C. § 1115(b).

As to the likelihood of confusion between the CrossFit Mark and the New Marks, the First Circuit considers the following factors:  (1) the similarity of the marks; (2) the similarity of the services offered; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective customers; (6) evidence of actual confusion; (7) the defendant's intent in adopting the mark; and (8) the strength of the plaintiff's mark.  *Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d 56, 60-61 (1st Cir. 2008).  These factors overwhelmingly establish a likelihood of confusion here.

### A.      The CrossFit Mark and the New Marks Are Similar.

On their face, the CrossFit Mark and the Club's New Marks are "sufficiently similar" such that customers "might be confused about the source of the services desired."  *Star Fin. Servs., Inc. v. Aastar Mortgage Corp.*, 89 F.3d 5, 10 (1st Cir. 1996) (finding "Star Mortgage" and "Aastar Mortgage" confusingly similar); *Equine*, 68 F.3d at 546 (all that is required is enough similarity to confuse customers).

The similarity of marks is typically based on their sight, sound, meaning, and commercial impression.  *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 817 (1st Cir. 1987) (holding mark "Beetle" similar to trade name "Beetle Barn").  "CrossBox," "CrossKick," and "CrossTrain" look and sound like "CrossFit" because they begin with the same prefix, add a term related to fitness, and use the same "camel hump" stylization as CrossFit" – namely, capitalizing

the middle letter, like the "F" in "CrossFit." *See, e.g., Marketing Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 935 (6th Cir. 1999) (affirming that "WindMaster" and "WindBuster" "connote the same meaning and resemble one another in look and sound, especially given the similar script and capitalization of the fifth letter and the dominance of the 'Wind' prefix"), *overruled on other grounds*, *TrafFix Devices, Inc. v. Marketing Displays*, 532 U.S. 23 (2001); *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 846 F. Supp. 2d 1063, 1078 (N.D. Cal. 2012) (finding likelihood of confusion because, in addition to using the same spelling of the mark, "within the text, both marks have similar capitalizations within the lettering"); *Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC*, 2012 WL 4711917, at *13 (D. Neb. Oct. 3, 2012) ("the terms 'LovelySkin.com' and 'LivelySkin.com' are obviously very similar in appearance, down to the lack of a space and the capitalization of the 'S' in the middle of the name"). Similarly, "CrossTrain Fitness," with the capital "F" adjacent to "CrossTrain" is similar in appearance and commercial impression to "CrossFit."

Second, while the New Marks may include a different, subordinate fitness-related term, there is significant aural similarity between the CrossFit Mark and the New Marks, since listeners hearing the name "CrossFit," "CrossBox," "CrossKick," and "CrossTrain" will undoubtedly focus on "Cross," the syllable in each of the terms that is given the most emphasis. *See Coach Servs. v. Triumph Learning, LLC*, 668 F.3d 1356, 1368 (Fed. Cir. 2012) (appropriate to give more weight to a mark's dominant features in determining its commercial impression). And "CrossTrain Fitness" sounds like a full version of the word mark "CrossFit." Moreover, because the proper test for comparing marks is a consumer's general recollection, and not a side-by-side comparison, the slight differences between the CrossFit Mark and the New Marks will likely be overlooked or disregarded. *See Lebewohl v. Heart Attack Grill, LLC*, 890 F. Supp. 2d

278, 294 (S.D.N.Y. 2012) ("If the appearance of the marks is similar enough that it may confuse customers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark, there may still be similarity.").

Third, the meaning of the New Marks does not distinguish them. While the subordinate words "Box," "Kick," and "Train" purport to add some additional information, these terms do not significantly distinguish the New Marks. Both the CrossFit Mark and the New Marks use the word "Cross" to reference the high intensity, constantly varied workout regimens that fitness consumers have come to associate with CrossFit.

Finally, "Cross" is clearly the dominant portion of the New Marks, and should be given more weight than the other peripheral, fitness-related terms adjacent thereto. *See Maxwell Shoe Co., Inc. v. Edelman Shoe Co.*, 2004 WL 6225744, at *2 (D. Mass. Aug. 5, 2004) ("a court may recognize that a mark may have a dominant portion and give that portion more weight in its comparison"); 3 McCarthy § 23:44 ("If the 'dominant' portion of both marks is the same, then confusion may be likely, notwithstanding peripheral differences."). This is particularly so because "Cross" is the *first* word of each of the New Marks. *See Maxwell*, 2004 WL 6225744, at *3 ("the first word of a mark may be 'dominant' by virtue of its prime placement").

### B. The Parties Offer Similar Services.

Defendants have admitted that they offer the same services as CrossFit. *See* Dkt. 18 p. 14. Where, as here, the parties offer similar services, "this factor indisputably indicates a likelihood of confusion." *Star*, 89 F.3d at 10.[5]

---

[5] At the time Defendants filed their Opposition to CrossFit's Motion for Preliminary Injunction, Defendants claimed to offer the same type of high-intensity fitness services as CrossFit, including classes for boxing (now improperly referred to as "CrossBox").

### C.      The Parties Compete in the Same Channels of Trade, Advertise in the Same Manner, and Serve the Same Prospective Clients.

The next three factors – the relationship between the parties' channels of trade, the relationship between the parties' advertising, and the classes of prospective customers – which all favor a likelihood of confusion here, are frequently considered together. *See Boston Athletic Ass'n*, 867 F.2d at 30. Defendants have admitted that they "operate in the same channels of trade, may cater to the same customers, and advertise online." *See* Dkt. 18 p. 14; *see also* Dkt. 13 pp. 14-15 (analyzing the three factors).

### D.      There is Substantial Evidence of Actual Confusion.

A plaintiff "need not show actual confusion to prevail on its claim of service mark infringement; mere likelihood of confusion is sufficient." *Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F. Supp. 994, 1011 (D. Mass. 1988). Nevertheless, even at this early stage, CrossFit has uncovered evidence establishing consumers' confusion from Defendants' use of the CrossFit Mark. *See supra* pp. 10-11. Moreover, despite the entry of the Preliminary Injunction, Defendants are using the CrossFit Mark to deceive customers in the *same* marketing materials that advertise "CrossBox," "CrossKick," and "CrossTrain" classes. The Club's website describes these classes in terms that are almost identical to a description of CrossFit training. *See supra* pp. 7-10. By way of one example (among many), the webpage on the Club's website that describes the "CrossTrain Fitness Program" includes language ("universally scalable fitness program [that] is the perfect application for any committed individual regardless of experience") that appears to have been copied and pasted from CrossFit's website ("universal scalability making it the perfect application for any committed individual regardless of experience"). It is hard to imagine how consumers will not be confused about whether the

14

Club's "CrossTrain," "CrossBox," and "CrossKick" classes are CrossFit classes when Defendants have use identical words, phrases, and exercises to describe them.

### E.    Defendants' Intent Is Wrongful.

Defendants' marketing efforts are replete with evidence that they intentionally adopted the CrossFit Mark in order to trade on the goodwill associated with the CrossFit brand. Defendants have gone to great pains to associate the Club with CrossFit on the Club's website, prominently featuring "Cross" in their Marks, continuing to inundate the Club's website, blog, and Facebook pages with the word "CrossFit," and using unique words and phrases commonly associated with CrossFit. Defendants' intent to infringe the CrossFit Mark has grown more apparent over time. In addition, It was only after the Court entered the Preliminary Injunction that Defendants adopted these New Marks.

Also, CrossFit has repeatedly provided Defendants with detailed explanations about the manner in which Defendants' use of the CrossFit Mark violates trademark law and fails to comply with the Court's Preliminary Injunction. Despite CrossFit's good faith attempts to resolve these matters, Defendants have failed and refused to delete their infringing references to CrossFit, all in attempt to deceive customers and trade off CrossFit's goodwill. Defendants have even refused to remove material that they *agree* should be removed.

### F.    CrossFit's Mark Is Strong.

Factors relevant to the strength of a mark are "the length of time the mark has been used, its renown in the plaintiffs' field of business, and the plaintiffs' actions to promote the mark." *Star*, 89 F.3d at 11. These factors all demonstrate the considerable strength of the CrossFit Mark. First and foremost, as an incontestable mark, "CrossFit" is valid as a matter of law and is either inherently distinctive or has acquired secondary meaning. *See* 15 U.S.C. § 1115(b).

Second, since 1985, CrossFit has taken extensive steps to develop its brand and educate the public about CrossFit.  PI Aff. ¶4.  These and other efforts to publicize the CrossFit brand, such as strategic partnerships with Reebok and ESPN, have all served to further strengthen the CrossFit Mark.  *See CrossFit*, 2013 WL 1627953, at *3 (holding that "CrossFit has offered sufficient evidence to indicate that it owns a famous mark, including that it currently licenses over 4,600 affiliate gyms" and describing the CrossFit Mark as "distinctive" and "strong").  Third, the fact that the Club itself has flooded its online marketing materials with references to CrossFit speaks volumes about the strength of the Mark.

In sum, analysis of the eight factors persuasively demonstrates a substantial likelihood of confusion from Defendants' use of the New Marks.  Moreover, to the extent there is any doubt regarding the likelihood of confusion, that doubt should be resolved in CrossFit's favor.  *See Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1265 (1st Cir. 2003) (courts resolve "doubts about the likelihood against the newcomer because the newcomer has the opportunity and obligation to avoid confusion with existing marks").

## II.  CROSSFIT WILL BE IRREPARABLY HARMED IN THE ABSENCE OF IMMEDIATE INJUNCTIVE RELIEF.

Defendants' illegal use of the New Marks will irreparably injure CrossFit in at least three ways:  (1) by exploiting CrossFit's goodwill and reputation;  (2) by jeopardizing CrossFit's ability to police, protect, and control its trademark; and (3) by causing actual confusion in the fitness industry.[6]

---

[6] Traditionally, a presumption of irreparable harm arose when a trademark plaintiff seeking a preliminary injunction demonstrated a likelihood of confusion.  *See Swarovski Aktiengesellschaft v. Building #19, Inc.*, 704 F.3d 44, 53-54 (1st Cir. 2013).  In the context of patent infringement cases, the Supreme Court held in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393-94 (2006), that an injunction should not automatically issue once infringement has been established.  As the First Circuit explained in *Swarovski*, "[n]o circuit court has yet decided whether *eBay* abolishes the presumption of irreparable harm in trademark infringement cases."  704 F.3d at 54 (declining to address whether *eBay* bars presumption of irreparable harm in trademark disputes).  As in *Swaroski*, however, it is not necessary here

CrossFit has spent nearly three decades building up its goodwill and reputation and, as a result, the CrossFit Mark is directly associated with CrossFit's fitness training program. Defendants are attempting to cash in on CrossFit's immense goodwill and popularity, to the detriment of CrossFit.  Posts to the Club's Facebook page illustrate the real harm that CrossFit is suffering due to Defendants' infringement.  As one individual writing on the Club's Facebook page explained, "I actually think its pretty cool that this place [the Club] is offering it [CrossFit "style" training] so cheap…Hitting an even broader target audience."  Another declared "CrossFit style training!?  Sign me up!  Who needs all that affiliate fee nonsense when you can find a loop hole."  PI Aff. ¶32 & Exs. AA, BB.  These comments evidence the impact of Defendants' wrongful use of the CrossFit Mark and demonstrate the harm from the improper use of the CrossFit brand.

This potential misidentification and misuse of the CrossFit brand poses a serious threat to CrossFit's hard-earned goodwill and reputation.  *See Calamari*, 698 F. Supp. at 1013-14 ("The rights of the owner of a trademark are the protection of his good reputation and the ability to control the use of his mark."); *CrossFit*, 2013-WL 1627953, at *4 ("As long as [infringer] is operating in the same domain as CrossFit, namely HICT fitness instruction, and doing so under a similar mark, CrossFit is unable to exercise adequate control over its reputation and goodwill.").

Finally, as discussed above, CrossFit customers are genuinely confused about whether the Club's services are affiliated with CrossFit.  Accordingly, the irreparable harm in the absence of a modification of the Preliminary Injunction is real and significant.

---

to determine whether a likelihood of confusion continues to create a presumption of irreparable harm, as there is ample evidence of irreparable injury to CrossFit which would result from continued use of the New Marks.

## III.    THE BALANCE OF THE EQUITIES FAVORS CROSSFIT.

In light of the irreparable injury that CrossFit will suffer and the likelihood of CrossFit's success on the merits, the balance of equities favors CrossFit.  *See Keds*, 888 F.2d at 220.  The Club has only recently begun marketing and soliciting under the New Marks, while CrossFit has been using its Mark continuously for nearly three decades.  *See Calamari*, 698 F. Supp. at 1014 ("When balanced against the fact that plaintiff has engaged in extensive advertising and promotional activities over the past 15 years, the Court concludes that the harm to plaintiff outweighs any harm to defendants.").  Moreover, CrossFit is merely requesting that Defendants come up with different names for the fitness training services it provides.  CrossFit is not asking the Club to stop doing business.[7]

## IV.    AN INJUNCTION AGAINST THE CLUB IS CONSISTENT WITH THE PUBLIC INTEREST.

The First Circuit has recognized that providing trademarks with the greatest protection they can be given serves the public interest because it allows the public to depend on the constancy of the quality of the services it seeks.  *Volkswagenwerk*, 814 F.2d at 820; *Tanel Corp.*, 774 F. Supp. at 51 ("public interest is served by promoting fair competition and preventing consumer confusion").  In this case, public deception and confusion have already resulted and will continue unless the Club is enjoined from use of the New Marks.  CrossFit has earned the trust of millions of followers by providing effective, reliable, and consistent fitness, nutrition, and lifestyle advice.  The Club seeks to exploit that trust by describing its fitness programs

---

[7] Not only has CrossFit taken the time to actually propose names the Club might use for its services – such as non-stylized names like "Cross-train" or "Cross-training," descriptive terms like "Boxing" and "Kickboxing," and terms that are not confusingly similar to CrossFit, such as "BoxTrain" and "KickTrain" – Defendants *themselves* have used different names in the past to describe these services.  In a series of online promotions, for example, Defendants offered "Boxing Boot Camp Classes."  Klein. Aff. ¶16 & Ex. N.  The cost to the Club in complying with CrossFit's request will only involve the expense of changing the text of its website and marketing materials.  Whatever minimal financial harm that the Club may experience upon issuance of a modified injunction is greatly outweighed by the public confusion created by the Club's blatant infringement of the CrossFit Mark and damage CrossFit's goodwill and reputation.

(unregulated by CrossFit) using terms that resemble CrossFit.  Issuing such an injunction, therefore, is in the public interest.

## V.    THE "SAFE DISTANCE RULE" ALSO COMPELS THE ENTRY OF A MODIFIED PRELIMINARY INJUNCTION.

The "safe distance rule" counsels that "'an infringer, once caught, must expect some fencing in. . . . Thus, a court can frame an injunction which will keep a proven infringer safely away from the perimeter of future infringement.'" *Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd.*, 282 F.3d 23, 40-41 (1st Cir. 2002) (quoting 5 McCarthy on Trademarks, §30:4).  As the Fifth Circuit explained in *Sunbeam Products, Inc. v. West Bend Co.*:

> We need not consider each subsequent design modification in detail, as the district court possesses broad discretion to vindicate the preliminary injunction by prohibiting subsequent modifications that do not move a "safe distance" away from the trademark infringement.  In such a case as this, where the appellants have been found guilty of infringing the trade-mark rights of others, they should thereafter be required to keep a safe distance away from the dividing line between violation of, and compliance with, the injunction.
>
> The "safe distance" rule vests broad discretion in the district court, to ensure that the Lanham Act is not frustrated by manufacturers who seek to circumvent injunctions with subsequent modifications.  Accordingly, the "safe distance" rule permits the court to issue injunctions that sweep even more broadly than the Lanham Act would permit against a manufacturer who has not already been found liable for trademark infringement.  A competitive business, once convicted of unfair competition in a given particular, should thereafter be required to keep a safe distance away from the margin line—even if that requirement involves a handicap as compared with those who have not disqualified themselves.  Having crossed the line of fair competition, a manufacturer may be ordered to stand back from it.

123 F.3d 246, 260 (5th Cir. 1997) (internal citations and quotations omitted).  This case is a perfect example of the need for the "safe distance rule."

When the Court issued the Preliminary Injunction on September 30, 2013, it barred Defendants from using "'CROSSFIT,' including any substantially similar variation, such as 'CrossFit' or 'Cross Fit'" in connection with the provision of, or advertisement for, "Fitness

Training Services." After the Preliminary Injunction issued, Defendants changed their name from "Chelmsford Sports Club" to "CrossTrain Sports Club," incorporated the "Fitness isn't a sport its [sic] a lifestyle" as a tagline, and began marketing "CrossBox," "CrossKick," "CrossTrain," and "CrossTrain Fitness."

For the reasons set forth in greater detail above, coined terms like "CrossBox," "CrossKick," and "CrossTrain" look and sound like "CrossFit." Therefore, these terms do not maintain a "safe distance" from the CrossFit Mark. Similarly, the tagline "Fitness isn't a sport its [sic] a lifestyle" does not keep a safe distance from CrossFit.[8]

## CONCLUSION

For the foregoing reasons, the Court should grant CrossFit's Motion to Modify Preliminary Injunction and issue an order: (a) requiring Defendants to delete all references to, and restraining and enjoining Defendants from using, "CrossBox," "CrossKick, "CrossTrain," and "Fitness isn't a sport its [sic] a lifestyle" or substantially similar variations; (b) requiring Defendants to replace all references to "Fitness" with "fitness" when adjacent to "Cross" or any word containing the prefix "Cross"; and (c) restraining and enjoining Defendants using "Fitness" when adjacent to "Cross" or any word containing the prefix "Cross."

---

[8] Further, by using the CrossFit mark and availing themselves of the doctrine of nominative fair use, Defendants have eliminated their ability to use terms like "CrossBox," "CrossKick," and "CrossTrain" which look and sound like CrossFit derivatives. *See, e.g.*, *New Kids on the Block v. News America Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992) (party choosing to avail itself of nominative fair use of mark "must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder."). In the same vein, under nominative fair use, Defendants cannot use a tagline that is similar to CrossFit's tagline while simultaneously using CrossFit's trademark.

Respectfully Submitted,

CROSSFIT, INC.,
By its attorneys,

/s/ *Zachary C. Kleinsasser*
Victor H. Polk, Jr., BBO# 546099
polkv@gtlaw.com
Zachary C. Kleinsasser, BBO# 664291
kleinsasserz@gtlaw.com
Jessica Parker-Battle, BBO# 679362
parkerbattlej@gtlaw.com
Greenberg Traurig, LLP
One International Place
Boston, Massachusetts  02110
Tel: (617) 310-6000
Fax: (617) 310-6001

Dated:  February 25, 2014

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and that paper copies will be sent to those indicated as non-registered participants on February 25, 2014.

/s/ *Zachary C. Kleinsasser*

21