UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CROSSFIT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 13-11498-FDS |
| DONNY MUSTAPHA, individually, | ) | |
| and d/b/a CHELMSFORD SPORTS | ) | |
| CLUB, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION ON CROSSFIT'S
MOTION TO MODIFY PRELIMINARY INJUNCTION**

August 4, 2014

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff, CrossFit, Inc. ("CrossFit"), has brought this action against Donny

Mustapha ("Mustapha"), individually and doing business as the Chelmsford Sports Club

("CSC"), claiming that the defendants infringed upon its registered "CrossFit" trade-

mark.[1]  Specifically, CrossFit alleges that it has developed a unique fitness training

regimen, which has become the principal strength and conditioning program for

thousands of professional and amateur athletes throughout the world, and that it licenses

---

[1]  Throughout this Report and Recommendation, this court has used the term "trademark" to encompass both trademarks and service marks.  "Trademarks serve to identify and distinguish goods; service marks perform the same function for services."  Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 12 n.8 (1st Cir. 2008).  Although the CrossFit mark at issue is technically a service mark, the distinction makes no difference in the context of this case.

its "CrossFit" mark to entities and individuals who have engaged in specialized training and have entered into written affiliation agreements defining the terms and conditions of their relationship with the plaintiff.  It further alleges that CSC, which is owned by Mustapha, has been using the "CrossFit" trademark to advertise and promote its own fitness services even though it is not a CrossFit affiliate and has never been licensed or otherwise authorized to use the plaintiff's intellectual property.  By its complaint, CrossFit has asserted claims against the defendants, pursuant to the Lanham Act, for trademark infringement, false designation of origin, and trademark dilution.  It has also asserted a state law claim against the defendants for unfair and deceptive trade practices under Mass. Gen. Laws ch. 93A.[2]  Although the defendants were represented by counsel at the start of the litigation, they are presently proceeding pro se.

Pursuant to a Preliminary Injunction Order that was issued by the Court on September 30, 2013 and modified on April 25, 2014, Mustapha and CSC are currently enjoined from using the "CrossFit" trademark, including any substantially similar variation thereof, in connection with the advertising or provision of fitness training services.  The matter is presently before the court on "CrossFit's Motion to Modify Preliminary Injunction" (Docket No. 88), by which CrossFit is seeking to expand the scope of the preliminary injunction so that Mustapha and CSC also are:

---

[2]  Mustapha asserted counterclaims against CrossFit and third-party claims against various other parties.  However, all of those claims have been dismissed.  (See Docket No. 145).

(a)     required to delete all references to, and restrained and enjoined from using, "CrossBox," "CrossKick," "CrossTrain," and "Fitness isn't a sport its [sic] a lifestyle" or substantially similar variations;

(b)     required to replace all references to "Fitness" with "fitness" when adjacent to "Cross" or any word containing the prefix "Cross"; and

(c)     restrained and enjoined from using "Fitness" when adjacent to "Cross" or any word containing the prefix "Cross."

After careful consideration of the parties' written submissions and their oral arguments, this court recommends to the District Judge to whom this case is assigned that CrossFit's motion to modify the preliminary injunction be ALLOWED IN PART and DENIED IN PART.  Specifically, this court recommends that the defendants (1) be required to delete any remaining references to, and be restrained and enjoined from using, "Fitness isn't a sport its a lifestyle;" (2) be required to replace all references to "Fitness" with "fitness" when adjacent to "Cross"; and (3) be restrained and enjoined from using the word "Fitness" when adjacent to "Cross."  However, because this court finds that the factual circumstances presented at this stage in the litigation do not support CrossFit's remaining requests for relief, this court recommends that the plaintiff's motion for a modification otherwise be denied.

## II.  **FACTUAL BACKGROUND**[3]

On September 30, 2013, the Court issued a Preliminary Injunction Order enjoining

Mustapha and CSC from using or displaying the "Protected Mark," which was defined to

mean "'CROSSFIT,' including any substantially similar variation, such as 'CrossFit' or

'Cross Fit.'"  (Docket No. 28 ¶ 1(b)).  Specifically, the Order provided in pertinent part:

> 2.     Defendants shall not use or display the Protected Mark in connection
>        with the provision of Fitness Training Services.[4]
>
> 3.     Defendants shall not use or display the Protected Mark in any
>        Advertisement[5] for Fitness Training Services.
>
> 4.     Notwithstanding the foregoing, Defendants may use or display the
>        Protected Mark if legally permissible as a nominative fair use.  If
>        Defendants intend to make a nominative fair use of the Protected
>        Mark in connection with the provision of Fitness Training Services,
>        they shall provide a copy of each such proposed use to counsel for

---

[3]  The facts set forth herein are derived from the pleadings filed and orders issued in this case, as well as from the following evidence submitted by the parties at various stages in the litigation: (1) the Affidavit of Mojda Najafi ("Najafi Aff.") (Docket No. 14); (2) portions of the Affidavit of Donny Mustapha ("Mustapha Aff.") (Docket No. 19) that have not been stricken by the court; (3) the Affidavit of Zachary C. Kleinsasser ("Kleinsasser Aff. I") (Docket No. 34); (4) the Affidavit of Zachary C. Kleinsasser in Support of CrossFit's Motion to Modify Preliminary Injunction ("Kleinsasser Aff. II") (Docket No. 90); and (5) Exhibit A to the defendants' Memorandum in Opposition of Plaintiff's Modification of the Preliminary Injunction ("Def. Ex. A") (Docket No. 92).

[4]  The phrase "Fitness Training Services" is defined in the Preliminary Injunction Order to mean "any training, coaching, or education services concerning physical fitness or exercise." (Docket No. 28 ¶ 1(c)).

[5]  The term "Advertisement" is defined in the Preliminary Injunction Order to mean "any advertisement, flyer, brochure, billboard, display, direct mailing, television commercial, radio commercial, or similar communication of marketing, advertising, sales, or promotional information or materials directed to the general public or segments of the general public."  (Docket No. 28 ¶ 1(d)).

plaintiff no less than ten days before the actual use, so that the parties may have an opportunity to negotiate a resolution of any dispute or, if necessary, to contest the legality of the use before this Court.

(Id. ¶¶ 2-4).

## Changes to the Description of Defendants' Services

Following the issuance of the Preliminary Injunction Order, the defendants, who were then represented by counsel, sought approval from CrossFit to make certain nominative fair uses of the "CrossFit" mark. (Kleinsasser Aff. I, Ex. N). In addition, the defendants asked the plaintiff whether it would object to three proposed versions of a new logo. (Id., Ex. Q at 1-2). CrossFit objected to some but not all of the defendants' proposals. In particular, it is undisputed that CrossFit had no objection to the defendants' proposal to use the following text online:

5.  CrossFit, Inc. offers open-source workout routines at www.crossfit.com, posting a workout of the day ("WOD") every day on its homepage. Many CrossFit affiliates get their daily workouts from the same source. Though we're not a CrossFit affiliate and we make no claim that we're offering the CrossFit brand, we get many of our daily workout routines from the same source. Many people do the same WOD on their own at home, but the workouts posted on www.crossfit.com may be dangerous without the assistance of a fitness professional. We offer educated coaching and can create a scalable version of the daily workouts for your individual fitness needs.

6.  As you may know, CrossFit, Inc. is suing the Chelmsford Sports Club, alleging that we infringed its trademark for the term CROSSFIT®, an allegation we strenuously deny. On September 27, 2013, CrossFit, Inc. argued for a preliminary injunction to restrain us from referring to our cross-training fitness services as "Crossfit Style." The court issued the injunction but ordered that, while the

lawsuit continues, we can use the CROSSFIT® trademark to the extent legally permissible as a nominative fair use, and mandated that CrossFit, Inc. and [CSC] consult to negotiate any disputes over our proposed nominative fair use references to the CROSSFIT® trademark.

To avoid any confusion: the Chelmsford Sports Club is not affiliated with, or endorsed or sponsored by, CrossFit, Inc.  We have chosen to temporarily rename our cross-training fitness services as the "Crosstrain Sports Club" to convey exactly what we offer our members.  While we continue to litigate the dispute with CrossFit, Inc. in court, we remain committed to providing you quality cross-training fitness services that fit your individual needs.

(Id., Exs. N & O).  It is also undisputed that CrossFit had no objection to the defendants' proposal to use the phrase "CROSSTRAIN SPORTS CLUB" or to the defendants' proposal to use the following logo:



(See Kleinsasser Aff. I, Exs. N,                        O & Q at 1-2; Def. Ex.A).  Nevertheless, as part of its present motion, CrossFit is seeking to preclude the defendants' use of the term "CrossTrain," including their use of the phrase "CrossTrain Fitness."

By October 24, 2013, the defendants had changed the name of their facility to "CrossTrain Sports Club," and had begun to describe their fitness training services as "CrossTrain Fitness." (Kleinsasser Aff. II ¶ 3).  They also had renamed their fitness classes "CrossBox," "CrossKick," and "CrossTrain," and had started using the slogan "Fitness isn't a sport its a lifestyle" (collectively, the "New Marks").  (See id., Exs. B, C,

E, F & J).  While the New Marks did not incorporate the term "CrossFit," the plaintiff

argues that the terms "CrossBox," "CrossKick," and "CrossTrain" look and sound similar

to its trademark, and that the defendants' slogan is similar to CrossFit's tagline "Fitness

as a Sport."  It also contends that the manner in which the defendants have used the New

Marks is so closely tied to CrossFit that it creates a likelihood of consumer confusion and

constitutes trademark infringement.  For example, but without limitation, the plaintiff

contends that the defendants' description of their CrossBox and CrossKick classes are

similar to CrossFit's description of its training classes, and that the defendants have

improperly promoted their fitness training classes by comparing them directly to CrossFit.

### CrossFit's Motion for Contempt

On November 6, 2013, CrossFit filed a Motion for a Finding of Contempt and

Modification of Preliminary Injunction.  (Docket No. 32).  In support of its motion

CrossFit argued, inter alia, that the defendants had violated the Preliminary Injunction

Order by continuing to use its trademark to advertise their fitness training services online.

In particular, the plaintiff asserted that the defendants had repeatedly used the term

"CrossFit" in a manner that did not constitute a nominative fair use of the trademark, and

had improperly inserted links from CSC's website to the plaintiff's website without

permission.  (See Docket No. 33 at 1-2, 4-11).  Moreover, although the plaintiff had

approved the defendants' use of the phrase "CROSSTRAIN SPORTS CLUB," and a logo

that included the term "CrossTrain," it argued that the defendants' decision to re-name

their facility the "CrossTrain Sports Club," and to offer fitness services called

"CrossBox" and "CrossKick," amounted to an attempt "to benefit from the goodwill associated with the capitalization and appearance of the CrossFit name." (Id. at 10). Accordingly, CrossFit requested that the court hold the defendants in civil contempt of the Preliminary Injunction Order. It also requested that the court expand the scope of the injunction to restrain the defendants from using the CrossFit trademark in any manner, and from using the terms "CrossTrain," "CrossBox," and "CrossKick," "or variations thereof, which are stylized identically to the CrossFit mark." (Id. at 20). The defendants opposed the motion and asserted that they had acted in good faith in an effort to comply with the terms of the injunction. (See Docket Nos. 40 & 41).

On December 20, 2013, this court held a hearing on CrossFit's motion for a finding of contempt and modification of the Preliminary Injunction Order. At this court's urging, the parties agreed to engage in a process aimed at resolving their differences as to the contents of CSC's website and CrossFit's motion for contempt. (See Docket No. 49; Docket No. 81 at 1). Despite their efforts to carry out that process, the parties' negotiations proved unsuccessful. Consequently, CrossFit requested that its motion for contempt be allowed, and that the Preliminary Injunction Order be modified to preclude the defendants' use of the term "CrossFit." (Docket No. 81 at 14). In addition, CrossFit filed the present Motion to Modify Preliminary Injunction by which it is seeking to enjoin the defendants from using any of the New Marks, or from using the term "Fitness" when adjacent to "Cross" or any word containing the prefix "Cross," on the grounds that such

usage will cause consumers to confuse CSC's services with CrossFit, and that such marks do not maintain a "safe distance" from the CrossFit mark.

On April 24, 2014, the parties appeared at another hearing before this court. During the course of the hearing, the defendants agreed, without admitting liability, to refrain from using the term "CrossFit" in any manner whatsoever pending the outcome of the litigation.  On April 25, 2014, in accordance with the defendants' agreement, this court ordered that the Preliminary Injunction Order be modified to eliminate paragraph 4 relating to the nominative fair use of the plaintiff's trademark.  (Docket No. 122 ¶ 1(a)). Consequently, the Preliminary Injunction Order now precludes the defendants from using or displaying the term "CROSSFIT," or any substantially similar variation, such as "Cross-Fit" or "Cross Fit," in connection with the provision of any Fitness Training Services or in any Advertisement for Fitness Training Services.  Because this change resolved the principal issues raised by the plaintiff's contempt motion, this court also denied that motion without prejudice to renewal in the event the defendants fail to adhere to the terms of the Preliminary Injunction Order as amended.  (Id. ¶ 1(b)).

### The Remaining Dispute

While the defendants' agreement resolved the parties' dispute regarding the defendants' pretrial use of the term "CrossFit," it did not resolve CrossFit's request for an order precluding the defendants from using the New Marks or the term "Fitness" to the extent it adjoins "Cross" or any word containing the prefix "Cross."  Thus, on May 7, 2014, the parties appeared for a hearing on CrossFit's present Motion to Modify

Preliminary Injunction.  During the hearing, Mustapha stated that the defendants were no longer using, and did not intend to use, the slogan "Fitness isn't a sport its a lifestyle." Moreover, he has not disputed that the term "CrossFitness" is substantially similar to "CrossFit," or that the defendants should be restrained from using that term pending the outcome of the litigation.  (See Def. Opp. Mem. (Docket No. 92) at 2).  Accordingly, this court finds that the Preliminary Injunction Order should be modified to preclude the defendants' use of the slogan, as well as their use of the term "Fitness" with a capital "F" when adjacent to the word "Cross."

Because the defendants have not agreed to refrain from using the phrase "CrossTrain Fitness" to describe their fitness training services, or from using the terms "CrossTrain," "CrossBox," and "CrossKick" to describe the class offerings at CSC, the parties continue to dispute whether the defendants should be enjoined from such use pending the outcome of the case.  Subsequent attempts at mediation proved unsuccessful, so that this issue is ripe for decision.  Based on the present status of the record, and for all the reasons described herein, this court finds that the evidence is insufficient to warrant a preliminary injunction with respect to those Marks.

Additional factual details relevant to this court's analysis are set forth below where appropriate.

## III.  ANALYSIS

### A.    Preliminary Injunction Standard of Review

When confronted with a motion for a preliminary injunction, the court is required to weigh the following four factors: "'(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiff[]; and (4) the effect, if any, on the public interest.'" Swarovski Aktiengesellschaft v. Building No. 19, Inc., 704 F.3d 44, 48 (1st Cir. 2013) (quoting United States v. Weikert, 504 F.3d 1, 5 (1st Cir. 2007)). The burden is on the moving party to establish that consideration of these factors supports the issuance of a preliminary injunction. See Equine Techs., Inc. v. Equitechnology, Inc., 68 F.3d 542, 544 (1st Cir. 1995) (explaining that district court may grant a preliminary injunction when plaintiff shows that four factors have been satisfied). Moreover, "trial courts have wide discretion in making judgments regarding the appropriateness [or inappropriateness] of preliminary injunctive relief." Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).

"[W]hile each of the four factors is important, 'the cynosure of this four-part test is more often than not the movant's likelihood of success on the merits.'" Swarovski Aktiengesellschaft, 704 F.3d at 48 (quoting Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 115 (1st Cir. 2006)). "The importance of that inquiry is magnified in trademark cases because the resolution of the other three factors will depend in large part on whether the movant is likely to succeed in establishing infringement." Borinquen Biscuit Corp., 443 F.3d at 115. In addition, the "emphasis on likelihood of success is

fully consistent with the tenet that, as a matter of public policy, trademarks should be protected against infringing uses." Id.

In light of the defendants' agreement not to use the phrase "Fitness isn't a sport its a lifestyle," and their decision not to dispute the plaintiff's request to restrain their use of "CrossFitness," this court will confine its analysis to consideration as to whether the defendants should be preliminarily enjoined from using the terms "CrossBox," "CrossKick," or "CrossTrain," including the phrase "CrossTrain Fitness." For the reasons detailed below, this court concludes that the record does not support such relief.

### B.     Likelihood of Success on the Merits

"Before a party can succeed in an infringement action, it must demonstrate both that its mark merits protection and that the allegedly infringing use is likely to result in consumer confusion." Id. at 116. The First Circuit has "interpreted 'likely confusion' to mean 'more than the theoretical possibility of confusion.'" Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 12 (1st Cir. 2008) (quoting Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr., 103 F.3d 196, 200 (1st Cir. 1996)). Therefore, the trademark holder must show that the allegedly infringing conduct creates "'a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'" Id. (quoting Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO, 103 F.3d at 201). This court finds that while CrossFit has presented undisputed evidence showing that its trademark merits protection, it has not

demonstrated that it is likely to be able to establish a likelihood of confusion, as opposed to the possibility of confusion, arising from the defendants' use of the New Marks.

### i.      Eligibility for Trademark Protection

The record demonstrates that CrossFit developed its fitness training regimen in the 1980s, and that it has worked diligently over the last three decades to promote its CrossFit brand.  (Najafi Aff. ¶¶ 2-3).  It also demonstrates that CrossFit owns 16 federally registered trademarks for the word mark "CrossFit," including a service mark for fitness training that was registered with the United States Patent and Trademark Office on October 18, 2005.  (Id. ¶¶ 5-6 & Ex. A thereto).  "Under the Lanham Act, registration of a mark is prima facie evidence of 'the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration.'"  Black Dog Tavern Co., Inc. v. Hall, 823 F. Supp. 48, 53 (D. Mass. 1993) (quoting 15 U.S.C. § 1115(a)).  Where, as here, the owner has been using the registered mark continuously for at least "five consecutive years subsequent to the date of registration[,]" the right becomes incontestable, and "the registration is deemed to be conclusive evidence of the registrant's exclusive right to use the mark."  Id. at 53 n.5. See also 15 U.S.C. § 1065.  Therefore, CrossFit has shown that its mark is entitled to trademark protection.

### ii.      Likelihood of Confusion

"Once the determination has been made that a term is entitled to trademark protection, the pivotal inquiry becomes whether the allegedly infringing mark is likely to

cause consumer confusion." Equine Techs., Inc., 68 F.3d at 546 (quoting Boston Beer

Co. Ltd. P'ship v. Slesar Bros. Brewing Co., Inc., 9 F.3d 175, 180 (1st Cir. 1993)).  In the

First Circuit, this determination requires consideration of the following eight factors:

> (1) the similarity of the marks; (2) the similarity of the goods [or
> services]; (3) the relationship between the parties' channels of trade;
> (4) the relationship between the parties' advertising; (5) the classes
> of prospective purchasers; (6) evidence of actual confusion; (7) the
> defendant's intent in adopting its mark; and (8) the strength of the
> plaintiff's mark.

Borinquen Biscuit Corp., 443 F.3d at 120 (quoting Astra Pharm. Prods., Inc. v. Beckman

Instruments, Inc., 718 F.2d 1201, 1205 (1st Cir. 1983)).  "A proper analysis takes

cognizance of all eight factors but assigns no single factor dispositive weight."  Id.

### Factor 1: Similarity of the Marks

"Marks may be recognized as similar based on their appearance, sound and

meaning." Black Dog Tavern Co., Inc., 823 F. Supp. at 54.  However, the question

whether the parties' marks are sufficiently similar to cause a likelihood of confusion must

be assessed "on the basis of the total effect of the designation, rather than a comparison

of individual features." Id. (quoting Pignons S.A. de Mecanique de Precision v. Polaroid

Corp., 657 F.2d 482, 487 (1st Cir. 1981)).  "It is improper to 'dissect' a mark into

infringing and noninfringing parts: 'words are not to be compared syllable by syllable,

vowel by vowel and consonant by consonant.'" Maxwell Shoe Co., Inc. v. Edelman Shoe

Co., LLC, Civil Action No. 04-CV-10694-RCL, 2004 WL 6225744, at *2 (D. Mass. Aug.

5, 2004) (slip op.) (quoting Coca-Cola Co. v. Snow Crest Beverages, 162 F.2d 280 (1st

Cir. 1947)).  "Furthermore, similarity is not an isolated concept, to be observed in a vacuum where the two potentially similar marks are looked at side by side and the likelihood of confusion assessed; rather, courts should consider the totality of the circumstances surrounding the use of the marks[.]"  Stop & Shop Supermarket Co. v. Big Y Foods, Inc., 943 F. Supp. 120, 124 (D. Mass. 1996).  In other words, "[s]imilarity of the marks must be considered in light of what occurs in the marketplace, taking into account the circumstances surrounding the purchase of the goods or services."  Id. (quoting Calamari Fisheries, Inc. v. The Village Catch, Inc., 698 F. Supp. 994, 1009 (D. Mass. 1988)) (additional quotations and citation omitted).  After consideration of the circumstances surrounding the defendants' current use of the New Marks, as well as the total effect of those Marks based on their appearance, sound, and meaning, this court finds that the plaintiff has not shown that the first factor relating to confusion weighs in its favor.

In considering whether the parties' marks are similar, this court finds it significant that the defendants have abandoned their efforts to make nominative fair use of the plaintiff's trademark and are now enjoined from using "CrossFit" in any manner that is related to their fitness training services pending the outcome of the litigation.  The record indicates that at the time the plaintiff's motion to modify the preliminary injunction was filed, the "CrossFit" trademark appeared repeatedly on both CSC's website and in its online promotional materials.  (Kleinsasser Aff. I ¶¶ 15, 18; Kleinsasser Aff. II, Exs. B, J, K & L).  In particular, CrossFit has submitted evidence showing that prior to the expansion of

the injunction to preclude all use of the term "CrossFit," or any substantially similar variation thereof, the defendants had taken the disclaimer that CrossFit had approved as a nominative fair use of its mark and copied it onto every page of CSC's website, Facebook page and blog.  (Kleinsasser Aff. I ¶ 26).  It also presented evidence showing that CSC's Facebook page contained numerous links to CrossFit's website, and that the defendants were comparing their CrossTrain, CrossBox and CrossKick fitness classes to CrossFit training in their online promotional materials.  (See id. ¶¶ 16-17; Kleinsasser Aff. II, Exs. J, K & L).  By agreeing to remove all references to CrossFit from their website and other online locations, and to be restrained from using "CrossFit" pending the completion of the case, the defendants have altered the context in which consumers view the New Marks so as to eliminate any direct associations between the New Marks and the plaintiff's registered trademark.  As a consequence, CrossFit can no longer rely on the defendants' references to "CrossFit" in order to show that the New Marks are closely tied to its own.

This court also finds it significant that the defendants are no longer using the slogan "Fitness isn't a sport its a lifestyle."  The plaintiff has presented evidence showing that at the time it filed its motion to modify, the defendants were using the following logo:



(<u>See</u> Kleinsasser Aff. II, Ex. B at 1, 5-7). The defendants' decision to abandon their use of the slogan "Fitness isn't a sport its a lifestyle" eliminates any potential that consumers viewing their logo could confuse that slogan with CrossFit's tagline "Fitness as a Sport" or mistake CSC as an affiliate of CrossFit due to the defendants' use of the slogan. Therefore, the relevant question becomes whether reasonable consumers viewing the terms "CrossBox," "CrossTrain," and "CrossKick" in the context of the defendants' website and online promotional materials, without any references to CrossFit or to "Fitness isn't a sport its a lifestyle," are likely to confuse those terms with the CrossFit brand.

The plaintiff argues that the CrossFit mark and CSC's New Marks are sufficiently similar on their face to establish a likelihood of confusion. (Pl. Mem. (Docket No. 89) at 11). This court disagrees. There can be no dispute that the plaintiff's mark and the New Marks do share some common characteristics, which render them similar in both their design and appearance. Like the plaintiff's "CrossFit" mark, the New Marks combine the word "Cross" with a capital "C" with a second word relating to fitness that is also capitalized. Nevertheless, CrossFit has not shown that the parties' written marks share similar sounds or meanings. Although CrossFit's mark and each of the New Marks contain a common prefix, and "CrossTrain Fitness" incorporates the term "Fit" as well as "Cross," the parties' marks remain phonetically distinct. <u>Compare</u> <u>Star Fin. Servs., Inc. v.</u> <u>Aastar Mortg. Corp.</u>, 89 F.3d 5, 10 (1st Cir. 1996) ("a jury could supportably find that the total effect of [the designations 'Star Mortgage' and 'Aastar Mortgage'] – including

similarity in pronunciation – was to create a probability of confusion").  Furthermore, while both of the parties' marks contain terms relating to fitness, the words "train," "box," and "kick," even when linked with "cross," conjure up different images and connote different meanings than the plaintiff's mark.  See Black Dog Tavern Co., Inc., 823 F. Supp. at 55 (finding that the plaintiff's mark, "The Black Dog," and the defendant's marks, "The Black Hog" and "The Dead Dog," "connote very different meanings" that are unlikely to cause confusion).  In fact, CrossFit has expressly acknowledged that "cross-train" is a generic term "meaning exercising various body parts (as opposed to just one)," and that the defendants' use of "CrossTrain" is so general that it "does not differentiate [their] exercise services from any other company's exercise services."  (Kleinsasser Aff. I, Ex. R at 1).  Accordingly, it has not shown that consumers viewing the term "CrossTrain" are likely to associate it, much less confuse it, with "CrossFit."  Similarly, the defendants' use of the phrase "CrossTrain Fitness" to describe their services does not alter the generic nature of  "CrossTrain."  It merely clarifies the fact that cross-training is a type of fitness training, and that CSC's business involves exercise.

     While the terms "CrossBox" and "CrossKick" may be somewhat more specific than "CrossTrain," the plaintiff has not shown that they carry a similar meaning or evoke similar images as "CrossFit."  According to the plaintiff, "CrossFit's fitness training program is based on 'constantly varied functional movements performed at a relatively high intensity,' such as climbing rope, flipping tires, and jumping rope."  (Najafi Aff.

¶ 2).  Thus, the plaintiff advertises that its "program delivers a fitness that is, by design, broad, general, and inclusive.  Our specialty is not specializing.  Combat, survival, many sports, and life reward this kind of fitness and, on average, punish the specialist." (Kleinsasser Aff. II, Ex. H at 1).  In contrast, consumers viewing the terms "CrossBox" and "CrossKick" on the defendants' website are likely to conclude that they refer to a specialized type of cross-training focused on boxing and kicking, and to associate those classes with the present name of the defendants' facility, the "CrossTrain Sports Club." This conclusion is supported by evidence that the defendants often include a picture of a boxing glove and the tagline "CrossTraining and Boxing Collide" to advertise their CrossBox classes, and sometimes include the phrase "CrossTraining and KickBoxing" to describe their CrossKick classes.  (See id., Ex. B at 2, 4, 5, 16).  Thus, CrossFit has not established at this point in the proceedings that the terms "CrossBox" and "CrossKick" are likely to evoke CrossFit's unique training regimen in the minds of ordinary consumers, or that such consumers are likely to confuse the defendants' fitness classes with CrossFit's brand and services.[6]

---

[6]  During oral argument, the plaintiff argued that consumers are likely to confuse "CrossBox" with CrossFit because the plaintiff refers to its gyms as "boxes."  Although there is evidence indicating that CrossFit describes its gyms in this fashion (see Najafi Aff. ¶ 7), this court finds the plaintiff's argument unpersuasive.  "Box" is a common word that has different definitions in different contexts.  The context in which it is used on the defendants' website and in their other online promotional materials cannot reasonably be confused with a gym facility.  Rather, as indicated by the defendants' frequent use of images that depict a boxing glove or individuals engaged in boxing, as well as their description of CrossBox as a workout that blends boxing with other types of exercise, consumers are almost certain to conclude that "CrossBox" refers to a method of cross-training that focuses on boxing.  (See Kleinsasser Aff. II, Ex. B at 2-5, 13, 15 and Exs. C & E).

The plaintiff contends that the prefix "'Cross' is clearly the dominant portion of the New Marks, and should be given more weight than the other peripheral, fitness-related terms adjacent thereto." (Pl. Mem. at 13). This court "is cognizant that the first word of a mark may be dominant by virtue of its prime placement, and that if the dominant portion of both marks is the same then confusion *may* be likely, notwith-standing peripheral differences." Maxwell Shoe Co, Inc., 2004 WL 6225744, at *2 (emphasis in original) (internal quotations and citations omitted). Here, however, CrossFit has not shown that consumers viewing such a common term in connection with the defendants' promotion of the "CrossTrain Sports Club" are likely to mistake the defendants' services for CrossFit training.

As described above, CrossFit has acknowledged the generic nature of the word "Cross" when used as part of the term "CrossTrain," and has specifically approved the defendants' use of "CrossTrain" in their logo for CSC. (See Kleinsasser Aff. I, Exs. Q at 1-2 and R at 1-2; Def. Ex. A). It has not explained why the combination of "Cross" with the equally common words "Box" and "Kick" is any less generic than CrossTrain or more likely to cause confusion. Furthermore, the defendants' elimination of all references to CrossFit, and their use of boxing images and references to kickboxing, make it far less likely that consumers will associate CSC with CrossFit or mistake it for a CrossFit affiliate. Instead, the context in which consumers are presently viewing the New Marks serves to distinguish them from the plaintiff's registered trademark.

Finally, this court is not persuaded by CrossFit's suggestion that the defendants'

description of their training classes is so similar to a CrossFit class that consumers are

likely to confuse the New Marks with CrossFit's fitness training regimen.  (See Pl. Mem.

at 6-8).  According to the evidence submitted by the plaintiff, the following describes a

typical CrossFit workout:

> A regular CrossFit class takes anywhere from 45 minutes to an hour.
> Everybody starts at the same time, our coaches will be walking
> around helping out and keeping track, and everybody is supporting
> each other and helping you stay motivated.
>
> A typical class is typically split into three or four sections:
>
> - **Warm Up:**  This may include jogging outside, rowing, jump
>   roping, squats, push ups, lunges, pull ups and much more.  This
>   is followed by stretches, and mobility work that complement the
>   movements you'll be doing in the workout that day.
>
> - **Skill/Strength work:**  The workout could include a pure strength
>   movement (like squats or deadlifts), Olympic lifts (like snatch
>   and clean and jerk) or things like rope climbs, box jumps, pull
>   ups, one legged squats or muscle ups just to name a few!
>   Depending on the exercises in that workout, we will always work
>   on a skill that will be utilized in the workout and try to improve.
>   Every exercise has proper progressions and modifications and
>   can be tailored for every athlete at any fitness level!
>
> - **WOD:**  The workout of the day.  This is where you'll be told to
>   do a certain number of reps of particular exercises as quickly as
>   possible, or you'll have a set time limit to do as many of a certain
>   exercise as possible.
>
> - **Cool Down and Stretching:**  Done as a group, or instructed to
>   do on your own after class.  An important part of your cool down
>   and always encouraged!

(Kleinsasser Aff. II, Ex. D at 1-2).  On the other hand, the defendants describe their

CrossBox training classes as follows:

> CrossBox workouts blend strength training, traditional box[ing] and cardio conditioning to improve flexibility, agility, strength and endurance.  Interval training is the key.  Using short bursts of high-intensity exercise followed by rest periods, your body is pushed to adapt quickly.  The payoff?  You achieve maximum results in minimal time.  In addition, CrossBox utilizes a unique set of training tools designed to challenge the status quo of conventional fitness equipment.  Heavy bags, jump ropes, battle ropes, and sometimes even truck tires and sleds, are used along with plyometric exercises to create a balanced circuit where you safely progress at your own pace.  CrossBox is good for all fitness levels and can be scaled to your unique individual needs.

(Id., Ex. C).  This text is accompanied by a "CrossBox" logo that includes a large "X"

with a boxing glove between the words "Cross" and "Box," as well as the phrase

"CrossTraining and Boxing Collide" underneath.  (Id.).  A reasonable consumer viewing

the defendants' mark in this context is not likely to confuse it with CrossFit.

The defendants' description of their CrossKick classes supports a similar

conclusion.  The record contains a Groupon promotion for the "Crosstrain Sports Club"

in which the defendants describe their CrossKick classes as "[a] blend of boxing and

cross-training" that "combines a variety of exercises such as heavy bag work, jumping

roping [sic], plyometrics, and kettlebell swings to give members a full-body workout in

less time than it takes to complete a 5K or sign up for a 5K."  (Id., Ex. E).  The promotion

includes a large image of a woman wearing boxing gloves and throwing a punch.  (Id.).

Both the description of the class and the emphasis placed on boxing render the defendants' use of "CrossKick" readily distinguishable from CrossFit.[7]

In sum, this court finds that the plaintiff has not met its burden of showing that the total effect of the New Marks, as used in the marketplace, is sufficiently similar to the plaintiff's mark in terms of sight, sound and meaning to create a substantial likelihood of confusion. Although a factfinder may ultimately determine otherwise, this court finds that for purposes of the plaintiff's motion to modify the Preliminary Injunction Order, the first factor weighs in favor of the defendants.

## Factor 2: Similarity of  Services

The defendants have not disputed that the parties provide the same services.  (See Docket No. 18 at 14).  As evidenced by the descriptions of their respective classes, both parties offer fitness training services that incorporate high intensity workouts focusing on various parts of the body.  Therefore, this court finds that the second factor relevant to confusion weighs in favor of CrossFit.

## Factors 3, 4 and 5: Relationship Between the Parties' Channels of Trade, Advertising, and Classes of Prospective Purchasers

---

[7] CrossFit's challenge to the defendants' description of their "CrossTrain Fitness Program" is equally unpersuasive.  The plaintiff's primary criticism is that the online links for the defendants' "CrossTrain Classes" bring up web pages that repeatedly reference "CrossFit" and compare the defendants' program to CrossFit.  (See Pl. Mem. at 8).  As described above, however, the plaintiffs have been enjoined from making any references to "CrossFit" pending the outcome of the case.  To the extent their website continues to include that term, they risk the possibility of being held in contempt of the Preliminary Injunction Order.

"The overlap between the parties' trade channels, advertisers, and markets are three factors conventionally analyzed together." Stop & Shop Supermarket Co., 943 F. Supp. at 125 (quoting Copy Cop, Inc. v. Task Printing, Inc., 908 F. Supp. 37, 45 (D. Mass. 1995)).  Here, the record indicates that both parties target customers seeking specialized, high intensity fitness training services, but that they do so via different channels of trade.[8]  Specifically, the evidence indicates that CrossFit provides licenses to individuals who qualify to become CrossFit personal trainers, and to gyms that enter into a license agreement with the plaintiff and become an authorized CrossFit affiliate. (Najafi Aff. ¶ 7; Mustapha Aff. ¶ 2).  The defendants, in contrast, provide fitness training services directly to individuals who use CSC's facility in Chelmsford, Massachusetts. (See, e.g., Kleinsasser Aff. II, Exs. B, K & L).

Although the record demonstrates that both parties' services are advertised on the internet, it appears that the defendants' advertising pales in comparison to CrossFit's advertising in terms of both budget and scale.  (See id.; Najafi Aff. ¶¶ 3-4).  For example, the record shows that CrossFit publishes the "CrossFit Journal" on a monthly basis, has undertaken high profile marketing efforts including the establishment of a close promotional relationship with Reebok and the airing of advertisements during the 2012 Super Bowl, and has created a name brand that is widely recognized throughout the

---

[8]  In their opposition to the plaintiff's original motion for a preliminary injunction, the defendants did not dispute, "[f]or purposes of the motion, ... that the parties operate in the same channels of trade, may cater to the same customers, and advertise online."  (Docket No. 18 at 14).  However, they made no such concession in connection with the present motion to modify.

world.  (Najafi Aff. ¶¶ 3-4, 8).  In contrast, it appears that the defendants' advertising is targeted at individuals living in the Chelmsford area.  (See Kleinsasser Aff. II, Exs. B, K & L).  It also appears that advertisements for the defendants' services are limited almost exclusively to the internet, and do not include anything even remotely close to the plaintiff's professional, nationwide marketing efforts.  (See id.).  "Operating in different channels of trade and using different calibers of advertising minimize the likelihood of consumer confusion."  Unleashed Doggie Day Care, LLC v. PetCo Animal Supplies Stores, Inc., 828 F. Supp. 2d 384, 394 (D. Mass. 2010).

## Factor 6: Evidence of Actual Confusion

While "proof of actual confusion is not essential to finding likelihood of confusion[,]" it "is often deemed the best evidence of possible future confusion[.]"  Boston Duck Tours, LP, 531 F.3d at 25 (quotations and citations omitted).  In the instant case, CrossFit has not presented any evidence to indicate that consumers are actually confused by the defendants' New Marks.[9]  Therefore, this factor favors neither party.

## Factor 7: Defendants' Intent

---

[9]  Although CrossFit submitted evidence of actual consumer confusion between its services and the services offered by the defendants, it has since acknowledged that there is a significant question about the reliability of that evidence as it may have been created by its own agents.  Moreover, CrossFit has not pointed to any evidence of actual consumer confusion following the modification of the Preliminary Injunction Order to preclude all use of the term "CrossFit."  Nor has it shown actual confusion caused specifically by the defendants' adoption of the New Marks.

"Whether the defendant acted in bad faith in adopting its mark is another factor to be considered in determining the likelihood of consumer confusion." <u>Id.</u> at 25-26.  This court finds that the evidence is insufficient to establish that the defendants acted in bad faith when they adopted the New Marks.  As an initial matter, there is no dispute that CrossFit's registered trademark is limited to "CrossFit," and does not include any of the defendants' New Marks.  (<u>See</u> Najafi Aff. ¶ 6 & Ex. A).  Nor is it disputed that CrossFit specifically assented to the defendants' use of "Crosstrain Sports Club" and to their adoption of a logo consisting of the word "CrossTrain" with an "X" through it.  (Kleinsasser Aff. I, Exs. N, O & Q; Def. Ex. A).  Under such circumstances, the defendants' use of the words "CrossTrain," "CrossBox" and "CrossKick" as part of a coordinated marketing campaign for the newly named "Crosstrain Sports Club" is not suggestive of a bad faith attempt to trade on the plaintiff's goodwill.  (<u>See</u> Def. Opp. Mem. at 2 (describing use of New Marks as part of defendants' marketing campaign)).

The plaintiff argues that the defendants' continued and extensive use of its trademark, even after the preliminary injunction was entered, establishes their intent to evoke the CrossFit brand and to deceive fitness training customers into associating CSC with CrossFit.  (Pl. Mem. at 15).  As the defendants argue, however, CrossFit "had previously assented to Defendants' use of the Crossfit's Federally Registered Mark" by approving "Defendants' disclaimer explaining the open-source nature of Crossfit's blog as well as text further distancing Defendants from Crossfit."  (Def. Opp. Mem. at 1).  Additionally, CrossFit did not limit the context in which the defendants could use the

approved text or limit the number of times its mark could appear on the defendants'

website.  (Id.; see also Kleinsasser Aff. I, Exs. N & O).  Even assuming the defendants'

use of the plaintiff's mark was excessive and could not have been considered a fair

nominative use, it does not establish that the defendants acted with an improper intent

when they adopted the New Marks that are the subject of the present motion.

### Factor 8: Strength of CrossFit's Mark

The factors that are relevant in assessing the strength of the plaintiff's trademark

include "the length of time the mark has been used, the trademark holder's renown in the

industry, the potency of the mark in the product field (as measured by the number of

similar registered marks), and the trademark holder's efforts to promote and protect the

mark."  Borinquen Biscuit Corp., 443 F.3d at 121.  Here, CrossFit has presented undis-

puted evidence showing that its brand has been in existence since the early 1980s, and

that the "CrossFit" service mark used in connection with its fitness training services has

been registered since 2005.  (Najafi Aff. ¶¶ 2, 6).  In addition, CrossFit has submitted

uncontroverted evidence showing that it has made extensive efforts to develop and

promote the CrossFit brand, has undertaken various high profile marketing efforts,

including but not limited to, the airing of advertisements during the 2012 Super Bowl,

and owns a total of 16 federally registered trademarks for the word "CrossFit," including

its trademark for fitness training, as well as trademarks for fitness equipment, nutritional

supplements, computer software, entertainment services, clothing and footwear.  (Id.

¶¶ 3-5).  As a result of its efforts, CrossFit's website averages approximately 35 million

hits per year, the company has over 7,000 affiliated gyms worldwide, and it welcomes

nearly 70,000 competitors from over 70 countries to its annual "CrossFit Games," which

are broadcast worldwide on ESPN.  (Id. ¶ 4).  These facts warrant the conclusion that the

"CrossFit" trademark is strong, and that the final factor relevant to confusion weighs in

favor of the plaintiff.  See Equine Techs., Inc., 68 F.3d at 547 (upholding district court's

conclusion that plaintiff's mark was moderately strong where, among other things, the

mark had been in use for four years and had been registered by the PTO, plaintiff had

actively marketed and promoted its brand, and plaintiff had received favorable publicity

in the relevant industry); Black Dog Tavern Co., Inc., 823 F. Supp. at 58 (finding that

plaintiff's marks were strong where they had appeared on clothing for over a decade, had

become popular and widely known, and had gained exposure through advertising and

write-ups in magazines).

### Weighing of the Relevant Factors

After considering each of the relevant factors, this court finds that the plaintiff has

not demonstrated that it is likely to be able to establish a likelihood of confusion between

its "CrossFit" mark and the defendants' New Marks.  Although the record demonstrates

that the parties offer the same services, advertise online, and target the same group of

prospective customers, "these factors alone are insufficient to establish a successful claim

of infringement."  Boston Duck Tours, LP, 531 F.3d at 26.  As described above, CrossFit

has failed to establish that the parties operate in the same channels of trade or that the

defendants acted in bad faith by adopting the New Marks.  Nor has it presented evidence

of actual confusion caused by the defendants' use of the New Marks.  Moreover, while the record demonstrates that CrossFit's service mark is strong, "the most important factor in the [eight factor] analysis is the similarity-of-marks inquiry."  Id.  See also Stop & Shop Supermarket Co., 943 F. Supp. at 124 (finding that plaintiffs' failure to establish similarity of the parties' marks weighed "strongly (and dispositively) in favor of defendant").  Because CrossFit has not shown that its mark and the New Marks are substantially similar based on their sight, sound and meaning in the marketplace, this court finds that the relevant factors do not establish a likelihood of confusion between the parties' marks.  "That conclusion means that [CrossFit] has failed to establish a likelihood of success on the merits of its trademark infringement claim" as it relates to the New Marks.  Boston Duck Tours, LP, 531 F.3d at 27.

### C.  Remaining Preliminary Injunction Factors

Where the moving party fails to demonstrate a likelihood of success on the merits, "the remaining [preliminary injunction] factors become matters of idle curiosity."  New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).  Consequently, they merit no more than a brief discussion.  As described below, this court finds that those factors also favor the defendants.

Absent a likelihood of success on the merits, a plaintiff seeking a preliminary injunction must present proof of actual harm.  See Unleashed Doggie Day Care, LLC, 828 F. Supp. 2d at 396.  CrossFit has failed to satisfy that requirement in the instant case.  The plaintiff argues that the defendants' use of the New Marks will cause it irreparable

injury "(1) by exploiting CrossFit's goodwill and reputation; (2) by jeopardizing CrossFit's ability to police, protect, and control its trademark; and (3) by causing actual confusion in the fitness industry."  (Pl. Mem. at 16).  However, "it is difficult to see how irreparable harm could be established without a finding of confusion[.]"  Swarovski Aktiengesellschaft, 704 F.3d at 54.  In the absence of such a finding, this court cannot conclude that the defendants' use of the New Marks have had or will have any impact on CrossFit's goodwill or reputation, or present any threat to its ability to control the "CrossFit" trademark.  Therefore, the plaintiff has not established irreparable harm.

The balance of hardships also weighs in favor of the defendants.  While there is no evidence of harm to CrossFit if the preliminary injunction is not modified, the issuance of an injunction would require the defendants to alter their entire marketing campaign and rename their fitness club, after having already done so in order to comply with the original preliminary injunction.  Thus, in addition to the cost involved in such efforts, they would risk losing any goodwill that they have created to date through the use of the New Marks.

Finally, "[a]bsent infringing activities, the public interest is best served by com-petition between [the parties]."  Unleashed Doggie Day Care, LLC, 828 F. Supp. 2d at 396.  Accordingly, the plaintiff has not shown that it is entitled to relief.

### D.      Application of the "Safe Distance" Rule

CrossFit argues that the defendants should be precluded from using the New

Marks in any event, and from using the term "Fitness" with a capital "F" when adjacent

to any word containing the prefix "Cross," because this case presents "a perfect example

of the need for the 'safe distance rule.'"  (Pl. Mem. at 19).  In particular, CrossFit argues

that because the terms "'CrossBox,' 'CrossKick,' and 'CrossTrain' look and sound like

'CrossFit[,]'" they "do not maintain a 'safe distance' from the CrossFit Mark."  (Id. at

20).  It further argues that the defendants should be prohibited from using any other terms

"that do not move a 'safe distance' away from trademark infringement."  (Id. at 2).  This

court finds that it would not be appropriate to apply the safe distance rule in this case.

The so-called "safe distance rule" "counsels that 'an infringer, once caught, must

expect some fencing in[.]'"  Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd., 282

F.3d 23, 40 (1st Cir. 2002) (quoting 5 J.T. McCarthy, McCarthy on Trademarks & Unfair

Competition ("McCarthy on Trademarks") § 30:4, at 30-12 (4th ed. 2001)).  It enables a

court to "frame an injunction which will keep a proven infringer safely away from the

perimeter of future infringement."  Id. (quoting 5 McCarthy on Trademarks, § 30:4, at 30-

12).  As the Fifth Circuit explained in upholding a district court's modification of a

preliminary injunction to include new designs proposed by the defendant following the

issuance of the injunction:

> the district court possesses broad discretion to vindicate the prelimi-
> nary injunction by prohibiting subsequent modifications that do not
> move a "safe distance" away from the trademark infringement.  In

> such a case as this, where the appellants have been found guilty of infringing the trade-mark rights of others, they should thereafter be required to keep a safe distance away from the dividing line between violation of, and compliance with, the injunction.
>
> The "safe distance rule" vests broad discretion in the district court, to ensure that the Lanham Act is not frustrated by manufacturers who seek to circumvent injunctions with subsequent modifications. Accordingly, the "safe distance" rule permits the court to issue injunctions that sweep even more broadly than the Lanham Act would permit against a manufacturer who has not already been found liable for trademark infringement.  A competitive business, once convicted of unfair competition in a given particular, should thereafter be required to keep a safe distance away from the margin line– even if that requirement involves a handicap as compared with those who have not disqualified themselves.  Having crossed the line of fair competition, a manufacturer may be ordered to stand back from it.

Sunbeam Prods., Inc. v. West Bend Co., 123 F.3d 246, 260 (5th Cir. 1997) (quotations, citations, alterations and footnotes omitted), abrogated on other grounds by TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 121 S. Ct. 1255, 149 L. Ed. 2d 164 (2001).  Thus, under the rule, a court may enjoin an infringer from using a new mark that does not maintain a safe distance from the plaintiff's trademark, even if the new mark does not infringe upon the plaintiff's trademark.  See Vining Indus., Inc. v. M.B. Walton, Inc., 106 F. Supp. 2d 966, 973 (S.D. Ohio 1997) (explaining that "under the safe-distance rule, this Court could enjoin the Defendant from continuing to use the phrase 'twist mop,' even in a manner which did not infringe upon Plaintiff's rights to the trademark, 'TWIST 'N MOP'").

This court recommends that CrossFit's request to apply the safe distance rule in order to modify the preliminary injunction be denied.  The plaintiff has not demonstrated that the defendants' use of the New Marks in connection with the online advertising and promotion of their newly named CrossTrain Sports Club is likely to cause consumer confusion.  As a result, it has not established a sufficient justification for application of the rule in this case.  See Tamko Roofing Prods., Inc., 282 F.3d at 41 (finding that even if the defendant's use of an abbreviation of the plaintiff's trademark would not be protectable as an independent mark under trademark law, evidence that the defendant's use of the abbreviation would cause confusion was sufficient to justify an injunction requiring the defendant to steer clear of the abbreviation); Vining Indus., Inc., 106 F. Supp. 2d at 973-74 ("since the Court has found . . . that the use of the phrase 'twist mop' in the manner proposed by the Defendant would not create a likelihood of confusion[,] . . . the safe-distance rule would prevent Defendant from engaging in otherwise lawful activity").

To the extent CrossFit contends that the safe distance rule should apply because the defendants abused their right to make fair nominative use of the plaintiff's trademark, or because they adopted a slogan similar to CrossFit's tagline while simultaneously using CrossFit's trademark, this court disagrees.  (See Pl. Mem. at 20 n.8).  To date, a full record has not been developed, and there has been no showing that the defendants acted in bad faith when they sought to make fair nominative use of CrossFit's mark.  In the absence of such a record, this court does not find it appropriate to punish the defendants

through the use of the safe distance rule.  <u>See</u> <u>Vining Indus., Inc.</u>, 106 F. Supp. 2d at 974

(declining to punish the defendant, "by employing the safe-distance rule to prevent it

from engaging in activity which does not infringe upon the Plaintiff's trademark[,]"

where it had not been finally determined, based on a full record, that the defendant had

acted willfully and not in good faith).

"At trial, when critical facts such as evidence of actual confusion . . . can be more

fully borne out," CrossFit may very well be able to prevail on the merits of its claims and

show that broad injunctive relief is warranted.  <u>Maxwell Shoe Co., Inc.</u>, 2004 WL

6225744, at *6.  However, at this stage, CrossFit has not demonstrated that the defen-

dants' use of the New Marks is likely to confuse consumers or that they should otherwise

be precluded from using the New Marks in connection with CSC's business.

## IV.  <u>CONCLUSION</u>

For all the reasons detailed herein, this court recommends to the District Judge to

whom this case is assigned that CrossFit's motion to modify the preliminary injunction be

ALLOWED IN PART and DENIED IN PART.  Specifically, this court recommends that

the defendants (1) be required to delete any remaining references to, and be restrained

and enjoined from using, "Fitness isn't a sport its a lifestyle;" (2) be required to replace

all references to "Fitness" with "fitness" when adjacent to "Cross"; and (3) be restrained

and enjoined from using the word "Fitness" when adjacent to "Cross." However, this

court recommends that the plaintiff's motion otherwise be denied.[10]


                                               / s / Judith Gail Dein              
                                               Judith Gail Dein
                                               U.S. Magistrate Judge

---

[10] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).